**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NORBAR, INC., Respondent.**

No. 83–5807.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 1, 1984.

Decided Jan. 16, 1985.

Elliott Moore, Lawrence Blatnik (argued), Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

J. Michael Fischer (argued), Ennis & Roberts, Cincinnati, Ohio, for respondent.

Before STEWART, Associate Justice (Retired),* LIVELY, Chief Judge, and WELLFORD, Circuit Judge.

## I.

WELLFORD, Circuit Judge.

This case is before the court pursuant to Section 10(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(e). Petitioner, the National Labor Relations Board (the "Board"), seeks enforcement of its decision finding respondent, Norbar, Inc. ("Norbar"), in violation of sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3). That decision is reported at 267 N.L.R.B. 148. Jurisdiction is properly invoked in this court since the alleged unfair labor practices took place in Sharonville, Ohio, a suburb of Cincinnati.

Norbar is engaged in the business of transporting bulk mail by truck for the United States Postal Service. Norbar operates out of Sharonville, Ohio. This company, along with two related companies engaged in the same type of business,[1] is owned by a single parent company, Hartco. David A. Hartman is the owner of Hartco, and was the president and chief executive of Norbar at all times relevant to the instant action.

In February 1980, Hartman decided to take direct control over Norbar in an effort to increase the company's profitability. At this time, Hartman sent memos to each of the respective companies he owned, including Norbar, explaining the company's present financial condition and stating the improvements that he expected. One of the main reasons for the company's financial problems, Hartman concluded, was the failure of management to compel compliance with established policies. This failure resulted in poor driving habits, increased fuel consumption, increased accidents, and a failure to make timely deliveries.

To correct the company's problems, Hartman decided to strictly enforce company policy. This was communicated to the employees; not only verbally, but through Hartman's actions. In 1980, Norbar began with 48 employees at its Cincinnati terminal. During the first eight months of 1980, 29 of these employees were terminated or quit. Norbar hired 28 employees during this same time period, 12 of whom were either terminated or quit.[2]

Sometime in March 1980, Norbar's employees began meeting to discuss the undesirable working conditions at the Cincinnati terminal. There was also some discussion of union representation at this time. As a result of these discussions, several employees, including Charles Burge, Lloyd Tucker, Howard Baumer, Jeffrey Snodgrass, and Phillip Seitz, attended union meetings and signed authorization cards. Snodgrass, Burge and Seitz also solicited other employees to sign union cards. In April 1980, the union (Truck Drivers, Chauffeurs, and Helpers Local Union No. 100, affiliated with Teamsters) filed a representation petition seeking certification as bargaining representative for the employees. On May 19 and 21, 1980, an election was held, with the union prevailing by a vote of 26 to 9. On May 30, 1980, the Board certified the union to represent the company's employees. A contract was finally negotiated in October 1980.

The charges of unfair labor practices under section 8(a)(3) of the Act center around the discharge of several different employees in the year following the union elections. The charge under section 8(a)(1) stems from facts tending to establish company threats made immediately prior to the election. As to the discharges, five separate events took place involving six different employees. Michael Green, a serviceman for Norbar, was discharged in November 1980, as was Jeffrey Snodgrass, a driv-

---

* The Honorable Potter Stewart, Associate Justice (Retired), Supreme Court of the United States, sitting by designation.

1. The two related companies operate out of Kansas City, Missouri, and Dallas, Texas.

2. This same high turnover rate took place in Hartco's Kansas City terminal.

ing instructor. Phillip Seitz, a driver for Norbar, was allegedly discharged in April or May 1981.[3] Charles Burge and Howard Baumer, drivers for Norbar, were both discharged as the result of an incident occurring in June 1980. Lloyd Tucker, a driver for Norbar, was also discharged in June 1980.

Various unfair labor practice charges were filed between June 30, 1980 and May 21, 1981. After a hearing the Administrative Law Judge (ALJ) found that Norbar had violated on a number of occasions section 8(a)(1) of the Act by threatening employees prior to the election. Also, the ALJ found that Norbar had violated section 8(a)(3) by discharging each of the previously mentioned employees. This decision was rendered on September 29, 1981.

Exceptions were duly filed to the ALJ's decision, and the NLRB concluded that with respect to the 8(a)(1) violation and the 8(a)(3) violations in connection with the discharges of Green and Seitz, the ALJ was correct. With regard to the discharges of the other four employees, however, the Board found no violations of section 8(a)(3) occurred. Rather, the Board found that in regard to these discharges the ALJ had improperly drawn an adverse inference against Norbar from the failure of a former employee to testify, and also incorrectly assessed the facts in a number of instances. The Board thus concluded that a violation of section 8(a)(1) was established, and also separate violations of section 8(a)(3) were demonstrated by the discharges of Green and Seitz only. Norbar, on appeal, claims that the ALJ's original decision was so tainted with error and bias that the entire award should be set aside, and also that there is not substantial evidence to support the Board's decision.

## II.

[1, 2] Section 7 of the Act, 29 U.S.C. § 157, guarantees to employees "the right to self-organization, to form, join or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 8(a)(1) in turn makes it an unfair labor practice for an employer "to interfer with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7." Section 8(a)(3) prohibits employer "discrimination in regard to hire or tenure of employment or any term or condition of employment to ... discourage membership in any labor organization." To establish a violation of Section 8(a)(1), it is generally sufficient to show that an employer's conduct tends to interfere with the employees' exercise of their Section 7 rights. *See, e.g., Propak Corp. v. NLRB*, 578 F.2d 169 (6th Cir.1978). At the same time, to establish a violation of section 8(a)(3) (and derivatively of section 8(a)(1)) it is generally sufficient to show a discharge of an employee for engaging in union activities. *See, e.g., NLRB v. Comgeneral Corp.*, 684 F.2d 367 (6th Cir.1982).

## A. The 8(a)(1) violation.

The ALJ found a violation of section 8(a)(1) and the Board agreed. This finding rested on evidence of company threats, coercion, and a general air of surveillance established by Norbar. In early May 1980, Terminal Manager Jack Flora called Tucker into his office, and in the presence of Carol Schafer, Flora's secretary, asked Tucker how he felt about the union. Flora also informed Tucker that he knew who the organizers of the union were, and stated that if the union were elected it could result in the employees being "out of work." Flora finally threatened to personally terminate Tucker if he were ever caught speeding.

Also in May 1980, Shop Foreman Gary Hardin called Snodgrass into the drivers' lounge, and informed Snodgrass that he knew who started "this g..d... union." Hardin continued by stating that he was going to get rid of "every one of those

---

3. Norbar seems to dispute the claim that Seitz was ever discharged, characterizing him as a "voluntary quit."

g..d... troublemakers." Again in May 1980, Flora called Seitz into his office and insinuated that if the union was ever to strike, the employees would be out of work. Several other incidents occurred immediately prior to the election where employees were asked how they felt about the union.

In mid-May 1980, Larry Walton, an employee of Norbar's, filed a claim for unemployment benefits as a result of his not being assigned work. Subsequent to this, Walton was informed by Carol Schafer (recently promoted to Terminal Manager) that it was not a good idea to apply for benefits, and that he should withdraw the application. Finally, an incident occurred where Hardin approached Baumer and asked him if he had been using Hardin's name for union business. Before Baumer could respond, Hardin threatened to "punch [Baumer] in the nose" if he had. As a result of this incident, Baumer filed charges with the Board, subsequent to which Hardin requested that Baumer withdraw them. Based on these findings, there was evidence to support the conclusion that Norbar violated section 8(a)(1) of the Act.

 The issue of whether a section 8(a)(1) violation has taken place is a question of fact for the Board, which must be sustained if supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 660 (6th Cir.1983). In the present case, there was direct testimony tending to establish all of the foregoing incidents, none of which was contradicted.[4] Norbar's sole attack is that this evidence was erroneously found to be credible by

the ALJ. It is well-settled that it is "the function of the ALJ to resolve credibility problems." *NLRB v. Downslope Industries, Inc.*, 676 F.2d 1114, 1116 (6th Cir. 1982). "This court will not normally disturb the credibility assessments of the Board or the Administrative Law Judge who has observed the demeanor of the witnesses." *NLRB v. Magnetics International, Inc.*, 699 F.2d 806, 813 (6th Cir. 1983). We find that the foregoing facts as found by the ALJ are supported by substantial evidence and support the conclusion that Norbar violated section 8(a)(1) of the Act.[5]

**B. The discharges of Burge, Baumer, Tucker and Snodgrass.**

The ALJ found that six employees were discharged as a result of their union activities, in violation of section 8(a)(3) of the Act. The Board disagreed in part, reversing this portion of the ALJ's opinion in regard to four of the employees; Burge, Baumer, Tucker and Snodgrass. Norbar now claims that the findings which were reversed by the Board taint the entire hearing by bringing into doubt all of the ALJ's credibility determinations, and by establishing bias on the part of the ALJ. It must be noted that the Board's findings in relation to these discharges are not challenged; rather, Norbar simply uses these findings to show the alleged inadequate performance of the ALJ in this case.

 Burge and Baumer were discharged following a delivery where they were over 27 hours late in reaching their destination. The almost uncontested facts are that the two drivers left Cincinnati at about 10:00

---

**4.** In relation to the 8(a)(1) violation, only one factual finding of the ALJ, not previously set out, was contradicted by direct testimony. The ALJ found that in a phone conversation between Green and General Manager Lloyd Harmon immediately following the election, Harmon stated: "Congratulations or condolences, which is it? ... Are you sure you want to take the job as union steward? You know it could cost you your job?" This finding was based solely on the testimony of Green, who claimed the foregoing incident took place over the phone while Green was in Plant Manager Ron-

ald Vaughn's office, with Vaughn present. Harmon, in his testimony, denied this conversation ever took place.

**5.** We find it significant that each factual finding, save one, supporting the 8(a)(1) violation, was completely uncontradicted. Therefore, even though the ALJ's credibility determinations are questionable in certain instances, *see infra* pp. 241–243, they must be sustained here. *Cf. Union Carbide Corp.*, 714 F.2d at 661–62.

p.m. on June 26, 1980. They then stopped in Corbin, Kentucky, about three hours after their departure. This was admittedly a violation of company policy, in that employees of Norbar are not to stop within the first five hours of departing the terminal. Once stopping, Burge and Baumer could not restart their truck, and when they finally did get the necessary repairs made they were already overdue at their destination. Subsequently, Burge and Baumer experienced further difficulty when the truck broke down again outside Knoxville, Tennessee. Rather than complying with company policy and attempting to seek help, neither employee left the truck for about four hours. Finally, Baumer did hitch a ride into Knoxville, where he obtained a tow-truck.

Despite these uncontroverted facts, the ALJ inexplicably found that the first stop was made only 21 miles into Kentucky, and that upon the second breakdown, Baumer left the truck immediately to get help. The ALJ further found that Baumer could not get a ride for over two hours before finally obtaining a lift into Knoxville. These findings found absolutely no support in the record, and the 8(a)(3) violations in relation to the discharges of Burge and Baumer were therefore properly reversed by the Board.

■ As to the termination of Tucker, the nearly undisputed facts are that Tucker, while making a delivery, drove into a construction sign that had blown onto the highway. Tucker was in the process of passing a car during a rainstorm when the accident occurred. Tucker was discharged following an investigation of the accident, because Norbar concluded he had not exercised "due care" and because of the extensive damage to the truck. It was established policy to discharge an employee under these circumstances. The ALJ, on the other hand, concluded that Tucker was not at fault, and that the damage to the truck was minimal, only $15.00. The ALJ therefore found that the discharge was a pretext, in violation of section 8(a)(3). The Board disagreed, finding there to be no

evidence that the damage was minimal. Also, it was normal procedure to discharge employees in cases such as this, and several had been discharged in the past. There was therefore no support for the finding of pretext, and the Board again correctly reversed this finding.

■ Finally, as to the termination of Snodgrass, a driving instructor the ALJ found he was discharged because of his union activities. The evidence indicated, however, that Snodgrass was terminated because of his unusually high fuel consumption, and because of his having been caught speeding. Both of these were violations of company policy. The findings of the ALJ that Snodgrass had an acceptable fuel consumption average, and when caught speeding had a defective speedometer, were not supported by the evidence. The Board therefore reversed this finding.

In each of the instances described as to Burge, Baumer, Tucker and Snodgrass, the ALJ drew an adverse inference against Norbar as a result of the failure of one of its employees to testify. The truth of the matter, as found by the Board, was that at the time of the hearing, the employee, Carol Schafer, was no longer employed by Norbar. No such inference should have been drawn. Indeed, the Board found no rationale for the adverse inference even if Schafer were still employed by Norbar.

Norbar now contends that the Board should have reversed the ALJ's determinations in regard to *all* of the discharged employees, not only because of the errors pointed to above, but also because of the ALJ's systematic crediting of the employees while discrediting those testifying for Norbar. Under the circumstances, Norbar challenges all credibility determinations of the ALJ, and requests a new hearing before a new ALJ.

It is clear that an ALJ can credit parts of a given witness's testimony, while discrediting other parts. *See Downslope Industries,* 676 F.2d at 1116 (testimony may be divisible). The Board therefore did not necessarily call into dispute each credibility determination made by the ALJ simply by

reversing some of his findings. The reversals by the Board, at the same time, do warrant a careful analysis of the ALJ's credibility determinations, and the conclusions he reached based on these determinations.

**C. The discharges of Seitz and Green.**

It is beyond dispute that the discharge of an employee for engaging in union activities forms the basis of an 8(a)(3) violation. *See NLRB v. Garon,* 738 F.2d 140 (6th Cir.1984); *NLRB v. A & T Manufacturing Co.,* 738 F.2d 148 (6th Cir.1984). On November 7, 1980, Green, a union steward, was accused of servicing a truck in an insufficient manner and then authorizing that truck's departure. Green denied this, explaining that he was not responsible for allowing the truck to leave. Green was suspended for seven days following this incident, and upon returning to work shortly thereafter found his timecard removed from the rack. Green claims that when he. asked about the timecard he was informed that he had been discharged. When he asked Vaughn why he had been discharged, he was told there were "ten reasons," none of which was explained.

Vaughn, on the other hand, tells the story differently. Vaughn testified that he told Green why he had been discharged, i.e. that he had been improperly servicing trucks. In any event, Green filed a grievance and was ultimately offered a potentially higher-paying job in settlement of the grievance. Vaughn testified that for some unknown reason Green refused the job. Green, in explaining why he refused the job, testified that the job offer was conditioned on his giving up his position as union steward. There is no other evidence to support or contradict either of these assertions. If Green's testimony is credited, a clear violation of 8(a)(3) was established. *Delco Air Conditioning Division v. NLRB,* 649 F.2d 390, 393 (6th Cir.1981). If Vaughn's testimony is believed, Green was discharged for improperly servicing trucks and for no other reason. His subsequent reinstatement had no strings attached, and

there was therefore no violation of section 8(a)(3).

■ Generally, credibility determinations are left to the Board. *NLRB v. Baja's Place,* 733 F.2d 416, 421 (6th Cir.1984). However, as was stated in *Delco Air:*

Although credibility determinations ordinarily are the prerogative of the Board, this court is unwilling to enforce a backpay award upon the uncorroborated testimony of [one] who would be the beneficiary of reinstatement and the backpay award.

649 F.2d at 393. *See also NLRB v. Container Corp. of America,* 649 F.2d 1213, 1216 (6th Cir.1981). *Delco Air* is much like the present case. There, an employee testified that he had been discharged, grieved, and was offered reinstatement conditioned on resigning as a committeeman. The court refused to accept his self-serving testimony as substantial evidence. Under the rationale of *Delco Air* it would appear that Green's self-serving testimony might be insufficient to establish an 8(a)(3) violation.

In *Union Carbide Corp. v. NLRB,* 714 F.2d 657, 662 (6th Cir.1983), the court referred to the principle established in *Delco Air* (quoted above) and stated:

The paradigmatic factual setting in which this principle has been invoked involves the testimony of an interested, charging party, who objectively has something to gain from a self-serving statement of the facts, *which is directly contradicted by the testimony of disinterested witnesses;* generally, in these cases the indicia of reliability are clearly weighted in favor of the contradicting witness.

(Footnote omitted and emphasis added).

■ In the present case, Green's testimony was not contradicted by the testimony of a disinterested witness. The contradicting testimony was that of Vaughn, a Norbar supervisor. The principle of *Delco Air* would not appear to be wholly applicable under this circumstance. Applying the rationales of both *Union Carbide* and *Delco Air* together, however, the ALJ's reliance on Green's testimony alone might

still be insufficient to establish an 8(a)(3) violation. Green's testimony was entirely self-serving and was uncorroborated. See *Delco Air*, 649 F.2d at 393. Vaughn, though also interested, directly contradicted the testimony of Green. *See Union Carbide*, 714 F.2d at 662. This, coupled with the ALJ's erroneous findings and inexplicable adverse inference drawn against Norbar, as have been set out, leads us to conclude that the ALJ's credibility determination here was tainted. We cannot tell whether the improper adverse inference may have affected the ALJ's reliance on the testimony of Green. Moreover, Green testified on behalf of his fellow employee, Snodgrass. This testimony was necessarily discredited by the Board when it reversed that part of the ALJ's decision dealing with the Snodgrass discharge. Once determined not credible in a material matter, we have some difficulty accepting Green's uncorroborated testimony concerning the circumstances of his own termination. There was other testimony which related to company resentment of Green's actions as union steward, but this does not directly relate to the episode bringing about the discharge. We accordingly do not find substantial evidence to support the finding of an 8(a)(3) violation in relation to Green. *Delco Air*, 649 F.2d at 393.

Next we consider whether the Seitz discharge constitutes an 8(a)(3) violation. The alleged discharge of Seitz took place in either April or May of 1981, about the time of the hearing before the ALJ. In December 1980, Seitz had fallen and injured his back. Seitz's doctor informed him that he could not return to full-time work before April 6, 1981. This information was apparently conveyed to Vaughn,[6] who, Seitz claims, then informed Seitz not to return until he was able to perform on a full-time basis, and also to give advance notice before returning. Seitz filed for workers' compensation.

On May 12, 1981, Seitz went to the terminal in an effort to post a sign-up list for an opening for the union steward position, and to 'sign-up' himself as a candidate. On May 16, 1981, Seitz received by certified mail an envelope containing three letters from Vaughn. Two of the letters were dated May 14, 1981, while the third was a copy of a letter dated April 15, 1981. The third letter indicated that since Seitz had not returned on April 6, 1981, he was presumed to have quit. The other two letters echoed this, but also indicated that Norbar was contesting Seitz's workers' compensation claim. At the hearing, Seitz denied ever having received the April 15 letter prior to its receipt in May, while Vaughn testified that he had in fact sent the letter in April. On May 22, 1981, Seitz went to the terminal and showed Vaughn a copy of a supplemental workers' compensation form, which purportedly demonstrated that Seitz was still unable to work. Vaughn would not accept this, and instead demanded a letter from Seitz's doctor, reiterating his position that Seitz had quit.

The ALJ and the Board found that the discharge was a result of Seitz's union activity. In reaching this conclusion, the ALJ questioned whether the purported April 15 letter was simply an effort to cover up the real reason for the discharge, i.e., Seitz's candidacy for union steward in May. In drawing this conclusion, the ALJ credited entirely Seitz's testimony and discredited that of Vaughn. The ALJ made scant reference to an investigative report by the Ohio Worker's Compensation Board, and the union contract provision relating to furnishing of a doctor's statement. The testimony of Seitz and of Vaughn deserve careful scrutiny in respect to these matters and other indications in the record.

▬ The ALJ's findings as to the Seitz termination lack clarity and leave us in doubt concerning the adequacy of his analysis in this regard. The Board's dissenting member, Hunter, found "numerous sub-

---

**6.** Seitz's testimony is far from clear on this point. He first testified that "I don't believe I told him [Vaughn] that [referring to his returning to work April 6]." He then testified on cross-examination: "I volunteered and told him that the doctor had given me these dates [the dates he would return to work part-time and full-time] and that he said he would send a statement to my employer."

stantive errors" by the ALJ in the record in this case; and the Board majority also noted "a number of significant errors" on the part of the ALJ. The premises upon which the ALJ made his determination with respect to the Seitz termination, furthermore, have been substantially undercut by the NLRB and by our decision in respect to the other terminations involved in this controversy. Accordingly, we remand this aspect of the case to another administrative law judge for a decision on the Seitz termination issue utilizing the record made heretofore and any other supplemental evidence deemed appropriate.

### III.

In summary, we find substantial evidence to support the determination of an 8(a)(1) violation. We AFFIRM those portions of the Board's order. We REVERSE, however, the Board with respect to its 8(A)(3) finding as to employee Green and decline enforcement of that part of the order, and we REMAND the issue relating to the alleged 8(A)(3) violation as to Seitz.