**CARRIER CORPORATION,**
**Petitioner (84–5741),**

**Pacemaker Driver Service, Inc.,**
**Respondent (84–5885),**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent (84–5883),**
**Petitioner (84–5885).**

**Nos. 84–5741, 84–5883 and 84–5885.**

United States Court of Appeals,
Sixth Circuit.

Argued May 2, 1985.
Decided July 30, 1985.

Robert H. Cowan, Gracey, Maddin, Cowan & Bird, Wade B. Cowan, argued, Nashville, Tenn., for Carrier Corp.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Fred Havard, argued, Washington, D.C.; Martin M. Arlook, Dir., Region 10, N.L.R.B., Atlanta, Ga., for N.L.R.B.

Wade B. Cowan, Robert H. Cowan, Gracey, Maddin, Cowan and Bird, Nashville, Tenn.; Carol Sue Nelson, Birmingham, Ala., argued, and Chris Mitchell, Constangy, Brooks & Smith, Birmingham, Ala., for Pacemaker Driver Service, Inc.

Before LIVELY, Chief Judge, MARTIN, Circuit Judge, and TIMBERS,* Senior Circuit Judge.

---

* Honorable William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

BOYCE F. MARTIN, JR., Circuit Judge.

Carrier Corporation seeks review of an order of the National Labor Relations Board which required it to reestablish its trucking domicile in Knoxville, Tennessee and to rehire and to make a backpayment to four employees. The Board cross-applies for enforcement of its order against Carrier and also seeks enforcement of its order against Pacemaker Driver Service, Inc. We deny Carrier Corporation's petition for review, and we grant the Board's cross-application for enforcement against Carrier. We also grant the Board's application for enforcement against Pacemaker, as modified.

## I.

Carrier Corporation, a large business primarily engaged in the manufacture and sale of air conditioners, operates Carrier Trucking Service (CTS) as part of its corporate operations. CTS handles approximately ten percent of the total freight transportation needs of Carrier and its affiliated companies. CTS is headquartered in Knoxville, Tennessee and is managed by Samuel Henninger, who reports to Carrier through its director of logistics, Sanford Abraham.

Instead of having terminal operations, as are common in the trucking industry, CTS maintains domiciles of equipment and driver teams. In Knoxville, at the time the domicile was closed, CTS had two driving units and two driving teams of two drivers each. CTS leased both its equipment and its drivers. The drivers were leased from Pacemaker Driver Service, Inc.

At the time of the closing of the Knoxville domicile, the drivers were not unionized, although at least on one prior occasion they had brought the issue of union membership to a vote. In 1979, the NLRB conducted a union election involving Pacemaker's drivers in Knoxville, Nashville, and Memphis. A narrow majority voted against the union in that election.

The alleged labor violations in this case began on January 29, 1981. On that day, Jonah Gates, one of the drivers at the Knoxville domicile, called David Hagaman,

Carrier's dispatcher in Knoxville, to inform him of his location. Hagaman told Gates that Henninger wanted to speak with him, and Henninger asked Gates what was wrong with Calvin Cooper, a driver domiciled in Nashville. Gates responded that Cooper was probably upset because he had to unload a trailer that he felt he should not have had to unload. Henninger then asked Gates if there was any union activity because Henninger had heard rumors that Cooper was interested in unionizing. Gates stated that he was not aware of any union activity, and Henninger said he would have to bring Cooper to Knoxville for a "fireside chat" with him.

A second incident occurred on February 5, 1981 when Gates called Hagaman to lodge a complaint about Hagaman's dispatching. Gates told Hagaman that if the situation did not improve the drivers "were just going to have to go union." Hagaman responded that if the drivers did unionize, Carrier would shut down the Knoxville facility, "that the drivers would lose their jobs and he [Hagaman] would lose his job."

The next incident occurred on February 26, 1981 when Hickman Ridley called Hagaman from Indiana to inform him of his whereabouts. Ridley told Hagaman that if the dispatchers "don't stop this harassment, ... it's going to end up in the Union vote again ...." In response to this statement, Hagaman said "if you go to a Union vote, ... they will close this place down, they'll fire you, and fire me, and they'll move the trucks out."

On March 13, 1981, Ridley spoke with Henninger about a traffic accident that had been reported to Henninger. At that time, Ridley informed Henninger that the drivers had been approached about "going union." Henninger said that if the drivers tried to go union, "Carrier will fire me, they'll fire you, and they'll move this place out of Knoxville."

On March 30, 1981, the drivers called Hagaman to receive their work assignments, and he informed them that their services were no longer needed because the

trucks were being moved from Knoxville. The drivers later received letters stating that they were on permanent layoff status effective immediately.

On April 2, 1981, a union representative filed a charge on behalf of the drivers with the NLRB. A hearing on the charge was held before an administrative law judge in April 1982. The administrative law judge determined that Carrier and Pacemaker were joint employers and that David Hagaman was a supervisor for Carrier. He further found that Carrier had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) by threatening to close its facility if the drivers engaged in union activity and had violated section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) by actually closing the domicile because of the drivers' union activity. As a remedy, the administrative law judge ordered the reestablishment of the Knoxville domicile and the reinstatement of the four drivers with backpay.

On April 13, 1984, a panel of the NLRB affirmed the decision of the administrative law judge and adopted the administrative law judge's recommended order with minor modifications. 269 N.L.R.B. No. 169, 116 L.R.R.M. (BNA) 1462 (Apr. 3, 1984).

## II.

Here, Carrier challenges every finding made by the Board. Pacemaker joins Carrier in arguing that Carrier is not a joint employer of the drivers and also contends that it was an innocent party that cannot be held liable for backpay. We turn first to the contention that Carrier is not a joint employer of the drivers.

■■■ All agree that the proper legal standard to determine if a joint employer

relationship exists is, "[W]here two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' within the meaning of the NLRA." *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982). Whether a company exercises such control as to be considered a joint employer is a factual issue to be determined by the Board. *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964). Because the issue is essentially factual, we must affirm the Board's conclusion if it is supported by substantial evidence on the record considered as a whole. *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985).

■■■ We conclude from the record there is substantial evidence to support the Board's conclusion that Carrier was a joint employer of the leased drivers. The following factors particularly support the Board's ruling. First, Carrier exercised substantial day-to-day control over the drivers' working conditions, while the drivers had only infrequent contact with Pacemaker. Second, there was evidence suggesting that Pacemaker officials consulted the Carrier officials over wages and fringe benefits for the drivers. *See NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d at 1125. Finally, under Carrier's leasing agreement with Pacemaker, Carrier had the authority to reject any driver that did not meet its standards and it could also direct Pacemaker to remove any driver whose conduct was not in Carrier's best interests.[1]

---

1. In arguing that Carrier is not a joint employer, Carrier and Pacemaker rely heavily on three recent Board decisions on the joint employer issue, *T.L.I., Inc.*, 271 N.L.R.B. No. 128, 117 L.R.R.M. (BNA) 1169 (July 31, 1984); *H & W Motor Express*, 271 N.L.R.B. No. 80, 116 L.R.R.M. (BNA) 1494 (July 31, 1984); *Laerco Transportation & Warehouse*, 269 N.L.R.B. No. 61, 115 L.R.R.M. (BNA) 1226 (Mar. 21, 1984). Citing these Board decisions, Carrier and Pacemaker argue that in similar fact situations as the

present case, the Board has not found a joint employer relationship. We do not believe, however, that these Board decisions are dispositive of this case for two reasons. First, because the joint employer issue is simply a factual determination, a slight difference between two cases might tilt a case toward a finding of a joint employment. For example, in *H & W Motor Express*, the terminal manager of the truck drivers was also a leased employee from the undis-

■ Carrier next argues that even if it is considered an employer of the drivers, David Hagaman, Carrier's dispatcher, is not a supervisor and his actions cannot be attributed to Carrier. Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11) defines "supervisor" as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.[2]

Here, we feel the record supports the finding of fact that Hagaman was a supervisor. The Board's conclusion is supported by the evidence showing that Hagaman and the other dispatcher were the primary contacts between Carrier and the drivers. Hagaman was responsible for giving the drivers their schedules and for routing and re-routing drivers when necessary. Hence, it can be concluded that Hagaman was in the position to "responsibly direct" the drivers. That Hagaman exercised independent judgment in directing the employers is illustrated, for example, by Sanford Abraham's concession that the dispatcher sometimes departed from the customer priority listing given them by Carrier.[3]

■ Carrier next argues that there was no substantial evidence to support the Board's finding that Hagaman and Henninger violated section 8(a)(1) by threatening the drivers with closure of the domicile if they unionized. The primary basis for Carrier's argument is its contention that the testimony of Jonah Gates, one of the drivers, was incredible and should not have been credited. As we recognized many times, "[t]he credibility determinations made by the administrative law judge and adopted by the Board are entitled to great weight." *Kusan Manufacturing Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir.1984) (citations omitted). *See also NLRB v. Norbar, Inc.*, 752 F.2d 235, 241 (6th Cir.1985). Moreover, the administrative law judge and the Board "can credit parts of a given witness's testimony, while discrediting other parts." *NLRB v. Norbar, Inc.*, 752 F.2d at 240. Although the administrative law judge found Gates not to be a "beacon of truth in a world of falsehood," we do not believe it was unreasonable to credit Gates' testimony on the section 8(a)(1) violation when considered in light of the record as a whole.[4]

■ Carrier also challenges the Board's conclusion that it violated section 8(a)(3). Section 8(a)(3) makes it an unfair labor

puted employer. In this case, the dispatchers were provided by Carrier. Similar factual distinctions can be made with respect to *T.L.I., Inc.* and *Laerco Transportation.* Second, the only question before this Court is whether in this particular case there is substantial evidence to support the Board's finding that Carrier was a joint employer. As we have discussed in the text, we believe there was ample evidence to support such a finding. Whether there could have been substantial evidence to support a finding of joint employment in the above-cited Board decisions is not an issue before the Court.

2. "The exercise of any one of the enumerated powers combined with 'independent judgment' is enough to make one a supervisor." *NLRB v. Wilson-Crissman Cadillac, Inc.,* 659 F.2d 728, 729 (6th Cir.1981) (citation omitted).

3. As an alternative holding, the administrative law judge found that Hagaman had the appar-

ent authority to speak for Carrier and was thus an agent of the corporation. Because we find Hagaman to be a supervisor, we do not need to reach the merits of this holding.

4. In attacking Gates' credibility, Carrier relies primarily on *Delco Air Conditioning Division v. NLRB,* 649 F.2d 390, 393 (6th Cir.1981), where this Court held that it "is unwilling to enforce a backpay award upon the uncorroborated testimony of [one] who would be the beneficiary of reinstatement and the backpay award." For the holding of *Delco* to apply, however, the employee's testimony must be both uncorroborated, *id.,* and contradicted. *NLRB v. Norbar, Inc.,* 752 F.2d at 239 n. 5. In this case, Gates, testimony was corroborated by driver Hickman Ridley's testimony that he was threatened in a similar manner. Gates' testimony as to his encounter with Hagaman was also completely uncontradicted as Hagaman was not even called as a witness.

practice for an employer to discriminate in regard to hiring or firing to discourage membership in any labor organization. In *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court recently approved the method established in *Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), for analyzing section 8(a)(3) cases. Pursuant to *Wright Line,* the General Counsel for the Board must first show that anti-union animus contributed to the employer's decision to lay off the employee in question. Once the General Counsel has made such a showing, the employer can still avoid being found guilty of an unfair labor practice if it can prove that the employee would have been laid off even if he had not engaged in union activity. *See Birch Run Welding & Fabricating, Inc. v. NLRB,* 761 F.2d at 1179.

■ In this case, there is abundant evidence to support the Board's conclusion that the closing of the Knoxville domicile was at least in part motivated by anti-union animus. Carrier, however, maintains that it has proven that the domicile would have been closed anyway for business reasons. We disagree. Although Carrier presented substantial evidence that Cincinnati became a desirable place to have a domicile, the pertinent question was why Carrier selected the Knoxville domicile as the one to close so that the trucks could be moved to Cincinnati. Carrier claims that the Knoxville domicile became less desirable because Carrier sold one of its plants in Knoxville and its trucks had to run empty for a considerable distance to reach the trucks' maintenance facility. The General Counsel, however, presented evidence that CTS did very little shipping for the Carrier plant in Knoxville that was closed. With respect to the location of the maintenance facility, the General Counsel presented evidence that the drivers would often avoid running

empty by loading their trucks before bringing them to the facility for weekend maintenance. Moreover, given the fact that Carrier had operated the domicile in Knoxville for an extended period of time while using the maintenance facility, the distance to the facility was not a significant enough factor to justify the move.

■ Finally, Pacemaker challenges the Board's decision to make it jointly liable for the backpay award. Pacemaker, relying on *NLRB v. Glueck Brewing Co.,* 144 F.2d 847 (8th Cir.1944), argues that it was a completely innocent party who should not be held monetarily responsible for Carrier's unfair labor practice. In *Glueck,* the court recognized that an independent contractor could not be held liable for an unfair labor practice if it was "an entirely innocent and unconscious instrument" of the perpetrator of the practice, but "[w]here an independent contractor knowingly participates in the effectuation of an unfair practice, it places itself within the orbit of the Board's corrective jurisdiction." *Id.* at 855. The General Counsel argues that Pacemaker was not a wholly innocent party because it "acquiesced without protest" in Carrier's decision to close down the Knoxville domicile.

We do not find the Board's argument to be convincing. The evidence in the case did not demonstrate that Pacemaker "knowingly participated" in the effectuation of the unfair labor practices. In fact, Pacemaker lost its only client in Knoxville because of Carrier's unfair labor practices. Under the circumstances, Pacemaker cannot be held monetarily responsible for violations it did not commit. The Board's order shall therefore be modified to remove Pacemaker's joint liability for backpay to the employees.

Carrier's petition for review is therefore denied, and the Board's cross-application for enforcement against Carrier is granted in full. The Board's application for enforcement against Pacemaker is granted as modified.[5]

---

**5.** Carrier also asks for a modification of the Board's order to allow it to relocate the Knoxville domicile "at any time in the future if it

deems best for business reasons to do so and is not impelled by the intent to deny to its employers the rights conferred by the statute." *Statler*

*Industries, Inc. v. NLRB,* 644 F.2d 902, 910 (1st
Cir.1981) (quoting *NLRB v. Preston Feed Corp.,*
309 F.2d 346, 352 (4th Cir.1962)). Because the
Board recognizes that Carrier's right to move

the domicile for legitimate business reasons is
implicit in its order, we do not think an explicit
modification is necessary.