867 F.2d 611
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
STORER COMMUNICATIONS OF JEFFERSON COUNTY, INC.,
Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
International Brotherhood of Electrical Workers, Intervenor.
 Nos. 88-5150, 88-5297.
 United States Court of Appeals, Sixth Circuit.
 Jan. 31, 1989.
 
 Before KENNEDY, RALPH B. GUY Jr. and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Petitioner appeals and respondent seeks enforcement of an NLRB decision finding that petitioner violated Secs. 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. Sec. 158 (1973). Because substantial evidence supports all of the Board's conclusions, we deny the petition for review and grant the Board's cross-petition for enforcement.
 
 I.
 
 2
 Petitioner Storer Communications of Jefferson County, Inc. operates a cable television system in the Louisville, Kentucky area. On November 14, 1984, the International Brotherhood of Electrical Workers, Local 2100 ("Union") filed a petition seeking to represent some of petitioner's employees. An election was held on January 11, 1985, and the Union lost. On February 3, 1986, the Union filed a second petition, and a second election was held on April 8, 1986. The Union won the second election, and petitioner raised objections to the election. A hearing was held on June 11-12, 1986, and on June 27, 1986 a hearing officer issued a report overruling the objections in their entirety. Petitioner filed exceptions to the hearing officer's report, and the matter is still pending.
 
 
 3
 At all times relevant to this appeal, David R. Bell was petitioner's Regional Vice President with overall authority over its Louisville operations. In February 1986, the day after Bell had conducted a larger meeting with 50-60 employees, Bell met privately with a Storer employee, Deno Barbour. Barbour was objecting to Storer's decision to terminate the employment of one of Barbour's friends. During the course of their conversation, Bell "told [Barbour] how [Bell] had been threatened with violence for refusing to strike at another company, and added that he liked to see strikers out because they were fairly easy to replace, he would not negotiate, and he would pack his bags and move to Florida before he would negotiate."[1] Bell admitted that he had told the story about union violence, but denied that he had threatened to pack his bags and move to Miami or that he would never negotiate with the Union.
 
 
 4
 On May 28, 1986, Bell conducted an "Ask the Manager" meeting which was attended by several of petitioner's employees. After originally stating that he did not wish to discuss the Union, Bell reminded the employees that they do not see "IBEW," the Union, anywhere on their paychecks. He further stated, "I keep hearing IBEW and I'll go to a phone, I'll call Miami, I'll recommend that the company be--the system be sold." Bell denied threatening to call Miami and advise that the system be sold if employees continued thinking about the Union.
 
 
 5
 Karen Adams began working for petitioner as a production assistant on January 19, 1981. She became a local originator ("L/O") operator on April 5, 1982. From November 1984 until June 1985, she did public access work at petitioner's Shively studio. In June 1985, petitioner closed the Shively studio, and Ms. Adams was given a choice among the St. Matthews, Valley Station, and Blossom Lane studios for her next assignment. She chose St. Matthews because it was the closest of the three to her son's nursery.
 
 
 6
 During both Union elections, Ms. Adams had acted as the Union's observer. This fact was well-known to management. In May 1986, after the second election, petitioner decided to close the Valley Station and Blossom Lane studios and move all public access functions to the St. Matthews location. At the time, petitioner employed two public access operators: Ms. Adams and Chuck Litterst. Although Ms. Adams had more seniority than Litterst, and Storer had made a similar transfer decision in February solely on the basis of seniority, Nick Smith, the program manager for petitioner's Louisville operation, decided to give the one public access position to Litterst. Ms. Adams was transferred to petitioner's Okolona location where she was trained on the Masterboard. Ms. Adams testified that approximately a week after the election, and prior to her transfer, her supervisor, David Wheeler, "said he wanted to know why I got involved again [in supporting the Union], that I was in St. Matthews, I worked by myself, I had the hours that [I] wanted, no one bothered me, why did I get involved again and mess up my cushy job." Wheeler further informed Ms. Adams that David Lee and Nick Smith, two of Storer's executives in Louisville, were "going through [her] personnel file with a fine tooth comb trying to find something wrong [in order] ... to make it rough" on Ms. Adams. When Ms. Adams questioned Wheeler about her transfer, he responded:
 
 
 7
 "Karen, it's their company, they can do what they want. You don't have a union in here so they can do what they want."
 
 
 8
 And, I said, "That's not fair."
 
 
 9
 And, he said, "You knew they were going to make it rough on you, and they're making it rough on you."
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 And, then he said, "You know why they're doing this to you."
 
 
 13
 And, I said, "Why?"
 
 
 14
 And, he said, "Because of your involvement in the Union."
 
 
 15
 And, he said, "You know they're going to make it rough on you."
 
 
 16
 Ms. Adams explained that the position in Okolona was much less appealing than her previous public access position for two reasons. First, while working in public access, Ms. Adams' hours had been 8 a.m. to 4:30 p.m. every day. When she was transferred to Okolona, the hours became very erratic, shifting between 8:00 a.m. to 5:00 p.m., 9:00 a.m. to 6:00 p.m., 10:00 a.m. to 7:00 p.m., 5:00 p.m. to 1:00 a.m., 12 midnight to 9:00 a.m., and 12 noon to 9:00 p.m. Furthermore, the Okolona Masterboard position required her to spend her entire work day monitoring seven television sets and inserting tapes into the machine to make sure that they play over the air. In her previous public access position, she had done all of the production work necessary to get a thirty minute show on the air. This position gave her considerably more contact with the public.
 
 
 17
 Nick Smith, the Program Manager in Louisville, testified that he chose Chuck Litterst for the public access position because he had more general broadcast production experience than Ms. Adams. He denied that Ms. Adams' union activities played any role in his decision.
 
 
 18
 After Ms. Adams had been transferred to Okolona, she made a commercial editing error on July 17, 1986 when she inserted a commercial for a Ford automobile dealer during the broadcast of the British Open golf tournament in place of the scheduled Mazda commercial. She testified that she made the error on her first full day working alone on the Masterboard after she had explained to her supervisor, David Wheeler, that she did not feel secure about editing and was not sure that she could handle it. When Wheeler discovered the error, he said to Ms. Adams: "Why in the hell did it have to be you? Now they're going to make a federal case out of this."
 
 
 19
 Subsequently, Ms. Adams received a memo from Nick Smith reprimanding her for the error and concluding with the following warning: "Be advised that any future neglect of assigned spot reel editing will not be tolerated." When another employee, Kathy Knoop, asked Wheeler if the memo was issued "because of the Union," Wheeler replied, "Well, Kathy, you know, as well as I do, that Karen made her bed, and now she has to lie in it." Memos to two other employees who had made similar mistakes were written in a less reprimanding tone. He concluded one memo by stating, "[y]our cooperation and attention to Masterboard operational needs is expected." In a memo written two weeks before Ms. Adams' error, Smith concluded by stating, "[i]f I can be of any assistance in making the above any clearer, please feel free to ask. I can't emphasize the importance of your cooperation in the above concerns. I need your commitment to ensure that all spots run, and that all discrepancies are reported properly."
 
 
 20
 The Union filed charges against petitioner on August 18, 1986, alleging numerous violations of Secs. 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. Sec. 158 (1973). After a four-day hearing before an administrative law judge in February 1987, the ALJ issued a decision holding, inter alia, that petitioner violated Sec. 8(a)(1) of the Act when Bell told Barbour that he would not negotiate with the Union. The ALJ specifically concluded that Barbour's recitation of what occurred at the meeting in Bell's office was more credible than Bell's testimony. The ALJ further concluded that Bell's statements at the "Ask the Manager" meeting "were designed to curb employee enthusiasm for the Union and carried an overt threat to sell the business if they persisted in that enthusiasm." He held that this threat violated Sec. 8(a)(1) of the Act. With regard to Karen Adams, the ALJ made specific findings that her testimony with respect to the statements attributed to David Wheeler was credible and that she was also credited when her testimony conflicted with that of Nick Smith. He went on to conclude that the selection of Chuck Litterst over Ms. Adams for the public access position resulted in the "transfer of Adams to a less desirable job with more onerous working conditions and different working hours [that was] designed to discourage Union membership and activities and thus violated 8(a)(3) and (1) of the Act." Finally, the ALJ concluded that the written warning issued to Ms. Adams was unlawfully motivated, and was issued to discourage her union activity. The ALJ therefore found that it violated Secs. 8(a)(3) and (1) of the Act.
 
 II.
 
 21
 Petitioner makes three assignments of error on appeal, all of which question the ALJ's factual determinations with regard to the actions taken by Petitioner's agents. Hence, the only question on appeal is whether substantial evidence supports the Board's factual findings. NLRB v. Challenge-Cook Bros. of Ohio, Inc., 843 F.2d 230, 232 (6th Cir.1988).
 
 A.
 
 22
 With respect to Bell's statements to Barbour, petitioner argues that Bell's account of the conversation "is inherently more plausible than Barbour's account." Petitioner's only argument in this regard seems to be that "it would not make sense" for Bell to threaten not to negotiate with the Union during a conversation about the discharge of another employee. This argument is completely meritless. "It is well-settled that it is 'the function of the ALJ to resolve credibility problems.' NLRB v. Downslope Industries, Inc., 676 F.2d 1114, 1116 (6th Cir.1982). 'This court will not normally disturb the credibility assessments of the Board or Administrative Law Judge who has observed the demeanor of the witnesses.' NLRB v. Magnetics Int'l., Inc., 699 F.2d 806, 813 (6th Cir.1983)." NLRB v. Norbar, Inc., 752 F.2d 235, 239 (6th Cir.1985). The issue of what was said in the conversation between Bell and Barbour is strictly one of credibility. The ALJ determined that Barbour's version was more credible than that of Bell. This court may not disturb that determination absent clear error.
 
 
 23
 Petitioner makes a substantially similar argument with regard to Bell's statements at the "Ask the Manager" meeting. Petitioner argues that because the meeting took place in May 1986, after the Union had won the election, it is unreasonable and illogical to believe that Bell would have made the statements at that time. Moreover, petitioner points to the testimony of Linda Britton, an employee who attended the meeting and corroborated Bell's version of what took place. However, as the ALJ pointed out, Ms. Britton admitted that she had left the room for approximately three minutes near the end of the meeting. Moreover, two witnesses, Sam Lively and Julie Wheeler, specifically testified that Bell did threaten to sell the system if employees persisted in thinking about the Union. Once again, the issue presented is purely one of credibility. The ALJ determined that Lively and Wheeler were more credible than Bell. In the absence of clear error, this court may not overturn that determination. Norbar, 752 F.2d at 239. We therefore affirm the Board's finding that both of Bell's statements violated Sec. 8(a)(1) of the Act because substantial evidence supports the ALJ's factual conclusions.
 
 B.
 
 24
 Petitioner next objects to the Board's finding that the decision to transfer Karen Adams from public access to Masterboard work at Okolona constituted a violation of the Act because she was transferred to a more onerous job as a result of her union activities. Petitioner argues that the ALJ failed to apply the Wright Line analysis for determining whether anti-union animus motivated an employer's decision.
 
 
 25
 In Wright Line, 251 NLRB 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982), the [National Labor Relations] Board reformulated the allocation of the burden of proof in such cases. It determined that the General Counsel carried the burden of persuading the Board that an antiunion animus contributed to the employer's decision to discharge an employee, a burden that does not shift, but that the employer, even if it failed to meet or neutralize the General Counsel's showing, could avoid the finding that it violated the statute by demonstrating by a preponderance of the evidence that the worker would have been fired even if he had not been involved with the union.
 
 
 26
 NLRB v. Transportation Management Corp., 462 U.S. 393, 395 (1983). The Supreme Court adopted the Wright Line test in Transportation Management Corp.
 
 
 27
 Petitioner argues that the ALJ erred in finding a violation of the Act with regard to Adams' transfer because the transfer did not occur until June 2, 1986, over eighteen months after her union sympathies became known by management. Petitioner further argues that the decision to transfer Ms. Adams was motivated solely by legitimate business reasons. Petitioner points to the testimony of Nick Smith that Ms. Adams was chosen to be transferred because of Chuck Litterst's extensive broadcast experience. Petitioner further argues that the transfer did not impose more onerous working conditions upon Ms. Adams because many other Storer employees at the same employment classification must work even less favorable hours than Adams and do the same work that she is now required to do. Petitioner contends that the ALJ erred in crediting the hearsay statements of David Wheeler as related by Ms. Adams. Petitioner argues that Smith, not Wheeler, made the decision to transfer Ms. Adams, and that his remarks therefore should not have been considered. Finally, petitioner argues that the ALJ erred in crediting Ms. Adams' testimony over that of Nick Smith because her testimony was inherently implausible.
 
 
 28
 We think petitioner's arguments are meritless. This court has observed that "[m]otive is subjective, and an employer rarely admits that an employee has been discharged because of activities protected by the Act. Therefore, the Board may rely on circumstantial evidence in determining actual motive." NLRB v. E.I. DuPont De Nemours, 750 F.2d 524, 529 (6th Cir.1984). In this case, there was both direct and circumstantial evidence supporting the ALJ's conclusion that petitioner's transfer of Ms. Adams was motivated by her antiunion activities. The statements by Wheeler constitute direct evidence. Petitioner's hearsay arguments with regard to those statements must be rejected because, as the ALJ found, Wheeler was the immediate supervisor of Adams, and therefore an agent of petitioner. Thus, his statements were the admissions of a party-opponent. See Fed.R.Evid. 801(d)(2)(D). Petitioner's arguments that it was Smith, not Wheeler, who made the final decision to transfer Ms. Adams are also unavailing. Smith consulted Wheeler with regard to the transfer decision and admitted that he would have changed his mind if Wheeler had given him reason. In addition to this direct evidence, there was also circumstantial evidence upon which the ALJ relied. In February 1986, petitioner based a similar transfer decision solely on seniority; Ms. Adams had more seniority than Chuck Litterst, yet Nick Smith refused to apply the criterion of seniority to the Adams transfer decision.
 
 
 29
 Petitioner ultimately rests its argument that the ALJ erred in finding a violation of the Act on its contention that the ALJ ought to have believed Nick Smith's testimony over that of Ms. Adams. Once again, petitioner's arguments must be rejected because the credibility finding of the ALJ will not normally be disturbed by this court. Norbar, 752 F.2d at 239. In sum, substantial evidence supports the factual findings of the ALJ, and petitioner's arguments to the contrary merely ask this court to substitute its judgment for that of the ALJ. "The Board's factual determinations as to motivation of a party are conclusive if supported by substantial evidence on the record considered as a whole, even if the court 'might have reached a different result had the matter been before [it] de novo.' " Local 594, Intern. Union UAW v. NLRB, 776 F.2d 1310, 1315 (6th Cir.1985) (quoting NLRB v. Buckhorn Hazard Coal Corp., 472 F.2d 53, 55 (6th Cir.1973)). We affirm the Board's conclusion that petitioner violated Secs. 8(a)(1) and (3) by transferring Ms. Adams.
 
 C.
 
 30
 Finally, petitioner objects to the ALJ's finding that the warning memorandum issued to Ms. Adams was motivated by her union activities, not by legitimate business reasons. Petitioner rehashes its previous arguments about the timing of the warning in relation to Ms. Adams' union activities--nearly two years after the petitioner first became aware of her support for the Union, petitioner's objection to the ALJ's reliance upon hearsay statements attributed to Wheeler, and the ALJ's decision to credit the testimony of Ms. Adams over that of Nick Smith. For the reasons discussed above, these arguments must be rejected. Substantial evidence supports the ALJ's conclusion that the warning issued to Ms. Adams was harsher than similar warnings issued to other employees for similar errors. A simple comparison between the memoranda Nick Smith wrote to Ken High, and John Junk, with that issued to Ms. Adams, highlights the disparity. The ALJ's conclusion is strengthened by the fact that Ms. Adams committed the error on her first day on the Masterboard after she had told her supervisor, Wheeler, that she was not confident about its operation. Finally, the statements made by Wheeler to both Ms. Adams and Kathy Knoop constitute direct evidence that the real reason for the memo was Ms. Adams' union activities. It is clear from an examination of the whole record that substantial evidence supported the ALJ's conclusion. We therefore affirm the Board's finding that petitioner violated Secs. 8(a)(1) and (3) of the Act by issuing a warning to Ms. Adams as a result of her union activities.
 
 III.
 
 31
 We conclude that substantial evidence supports all of the factual determinations reached by the ALJ. We therefore AFFIRM the Board's findings and order that its decision be enforced.
 
 
 32
 KENNEDY, Circuit Judge, concurring in part and dissenting in part.
 
 
 33
 I concur in enforcing the order of the Board with the exception of the directive that the reprimand given to Adams be withdrawn. What Adams did was more than make an editing error. She signed off, saying she had edited a tape when she had not done so. The error was not, therefore, due to her lack of experience in editing. The effect of Adams' error was more serious than the effect of those to which the ALJ compared it. The error caused the station to run a commercial promoting a Ford dealer's sale after the sale had concluded. And it caused the station to fail to run a commercial for Mazda, a new client. The ad could only be run during a golf championship program and so, could not be inserted in another time slot. Other employees' insertional errors could all be remedied by placing the commercials in different slots. Moreover, Smith's attention to Adams' error was heightened in that he was watching the program with the account representative when the wrong commercial appeared.
 
 
 34
 In finding that Smith's motive in giving the written reprimand was to punish Adams for her union support rather than because of her error, the ALJ relied on Wheeler's statement to Adams that she had made her bed and had to lie in it. This remark does not tend to prove that Adams received a written warning rather than an oral one because of her union affiliation. There is nothing in the remark which indicates it was based on any information Wheeler received from Smith.
 
 
 35
 The ALJ appears to have concluded Adams was singled out because copies of the reprimand were sent to other company officials. In view of the fact that apologies had to be made to two clients, Ford and Mazda, this is not surprising. Adams had made earlier less egregious errors and had not received a written warning. Other employees received written warnings, perhaps not as strongly worded but they were for correctable mistakes, spots that could be aired at another time.
 
 
 36
 Because I disagree that substantial evidence supports the Board's finding that the written reprimand was issued not because of Adams admitted mistake but because of her union activity, I would decline to enforce the portion of the Board's order requiring withdrawal of the reprimand.
 
 
 
 [1]
 Miami, Florida was and is petitioner's corporate headquarters