The LAWSON COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 83–5677, 83–5808.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1984.

Decided Jan. 21, 1985.

Michael T. McMenamin (argued), William
Gorenc, Jr., Walter, Haverfield, Buescher
& Chockley, Cleveland, Ohio, for petitioner.

Elliott Moore, Marjorie Gofreed, N.L.R.B., Washington, D.C., for respondent.

Before MARTIN, JONES and CONTIE, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

The Lawson Company petitions this court to review and set aside an order of the National Labor Relations Board, 267 N.L.R.B. No. 75 (1983), which found that Lawson had violated section 8(a)(1), (2), and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (2), and (3). The Board has cross-applied for enforcement of its order. With one modification, we grant the Board's application for enforcement.

Lawson operates about seven hundred convenience food stores in Ohio, Indiana, Pennsylvania, and Michigan and has its principal office in Cuyahoga Falls, Ohio. All of the incidents at issue occurred in northeastern Ohio, the Company's "Region Four." The unfair labor practices resulted from Lawson's attempt to disrupt the effort of the United Food & Commercial Workers Union to organize Lawson's retail sales assistants in Region Four.

On Wednesday, February 18, 1981, a sales assistant at one of Lawson's stores near Akron was murdered while on duty. The murder was widely publicized and scores of employees telephoned the Company to complain that the Company's security measures were inadequate. Many customers threatened to boycott Lawson stores until security was improved. Several stores were forced to temporarily close because employees refused to report to work.

On Friday morning, February 20, 1981, fifteen sales assistants telephoned the organizing director of the UFCW, asking that a Union organizational effort be undertaken in these stores. That evening and the next morning union organizers visited sixty stores in and around Akron. The organizers passed out authorization cards and invited the sales assistants to attend a union meeting. On Sunday, Lawson's president telephoned the Union's organization director and called his attention to a perma-
nent injunction against solicitations on Company property. The injunction had been entered by a state court during a prior union campaign in 1977. The Company threatened to have union organizers arrested if they continued soliciting on Company property.

On Monday, February 23, the Company held a meeting with approximately two hundred store managers. At this meeting high-level Company officials talked about the need to improve security. The officials also discussed the Union's organizing activities, emphasizing that Lawson had an injunction against in-store solicitations, that it expected its store managers to enforce the no-solicitation policy, and that a union was not necessary and would do the employees no good. Officials also told store managers that employees who had signed authorization cards could retrieve them from the Union, "otherwise the card[s] would be on file forever." This management directive to the store managers was not going to get very far because the managers realized, and they indicated to Company officials, they could not convey this message to the sales assistants because the assistants were justifiably concerned for their safety and their prior complaints had been ignored by high-level management of Lawson.

On Wednesday, February 25, Lawson held four unprecedented meetings for sales assistants. Approximately two hundred sales assistants attended each meeting and were paid for their time. Company officials at each meeting told the employees that they did not need the Union and that they could retrieve their authorization cards. Employees at the meetings complained about getting less than forty hours of work per week: they were told that a full work week would be made available. Employees complained of having no breaks, not even to use the restroom: they were told to close the store for five minutes if they had to use the restroom. Employees who complained of unpaid overtime work were told to leave their names with Company officials. Employees also com-

plained of having to work alone at night and poor lighting at the stores.

The next day, the Company sent a memorandum to all regional personnel which stated that all full-time personnel would enjoy a forty-hour work week. Shortly thereafter, Lawson installed canopy lights at the stores, adopted a policy that no one would be required to work alone at night, and began paying wages for work done after closing hours.

In the weeks following the initiation of the Union's campaign, Lawson posted no-solicitation signs in all its stores. One high-level management official told store managers that the signs were put up in order to keep the Union out. Some stores had not displayed no-solicitation signs since the last union campaign in 1977. Another Company official visited five or six stores per day for a number of weeks to ask employees how they felt about the Union. Other officials visited stores and removed any authorization cards they found. Employees were told by management that non-union solicitation, which previously was prevalent in the stores, could no longer be tolerated because "if Avon was going to come in or any of the other salespeople were to come in and try to solicit us, then the Union [w]ould be able to come in and solicit [as well]." A Company directive stated that any employee who violated the no-solicitation policy was subject to discharge.

In April 1981, Lawson held meetings at its Cuyahoga Falls training center for groups of thirty-five to fifty sales assistants, who again were paid for their time. Company officials told them that union membership or representation would be of little benefit to them. They were then asked to select representatives to serve on a committee which would meet with management every three months to discuss their complaints. The management of Lawson urged them to select experienced employees who did not think the Company was "in a mess." Management officials left the room while the employees selected their representatives. Employees then rec-

ommended subjects for the committee to discuss. The Company made a list of the ten most frequently mentioned items. On April 9 the Company announced that the first meeting of the "Sales Assistant Committee" would be held on May 6.

On April 24, the Union filed a representation petition with the Board, seeking an election in a unit of all Summit County, Ohio sales assistants. Lawson responded by holding a meeting of store managers on May 4. The Company president told the managers to tell the sales assistants that if they joined the Union, the Company would close the Summit County stores. Store Manager Barbara Wilson told her employees what she had been told to say. Wilson also told her employees that they should not discuss the Union because the Company planned to install listening devices in the stores. She also told the employees to get their authorization cards back from the Union. Four other store managers also testified that they told their employees that the Company would close the stores if the Union won the election. One manager also told employee Sandra Couch that she was the only employee at her store who signed an authorization card.

On May 6, the "Sales Assistant Committee" met with management. On May 18, Lawson sent to its sales assistants a document titled "Results of May 6, 1981 Sales Assistant Advisory Council Meeting." The document reported progress on the ten priority items:

*Vacation Pay* —A new vacation pay policy proposal based on anniversary date to anniversary date, as opposed to calendar year earnings, has been submitted to management.

*Hospitalization* —Improved health care benefits and their cost are being studied by Bruce Bastosky and will be presented at the next meeting.

*Sick Pay* —A proposed policy of earned sick days has been submitted to management.

*Holiday Pay* —Proposals of no minimum work requirement, change in holiday

hours for pay, and more paid holidays are being studied by management.

*Seniority*—The recognition of seniority in the store, as a means for fairer scheduling of hours has already been adopted as Regional Policy.

*Security Systems*—Improved security systems are currently being studied by management with recommendations made to the President of Lawsons within 6 weeks.

*Double Coverage*—Double coverage after 8:00 p.m. for Division 6 and 12 is permanent....

*Breaks*—A break policy will be issued by Region 4 management within 10 days.

*Death in Family Benefits*—Proposed policy revision to include grandparents, grandchildren, stepchildren and guardians has been adopted and a Region 4 policy will be issued within 10 days.

*Disciplinary Memo Appeal*—A procedure (through the "chain of command") for appeal of Disciplinary Memos will be issued as Region 4 policy within 10 days.

On May 19, Lawson sent another memorandum to its sales assistants which announced improvements in its life, major medical, and accident insurance plans. These improvements included major medical coverage on a voluntary basis with Lawson covering fifty percent of the cost; $5,000 in life insurance with Lawson covering one hundred percent of the cost; and personal accident coverage for employees and their dependants at a minimal cost to the employees. At about the same time, Lawson put into effect a new method of computing vacation pay that was advantageous to recently hired sales assistants, increased paid holiday time from three days to seven, expanded death-in-family benefits to include days off for the death of a grandparent, grandchild, step-child, or guardian, and revised its disciplinary appeal system. The Company also informed employees that the break policy instituted in February had received official sanction.

The Board found that Lawson violated section 8(a)(1) of the Act by soliciting employee grievances, expressly or impliedly promising to remedy them, and asking employees to withdraw their signed authorization cards. The Board also found that Lawson violated section 8(a)(1) by disparately enforcing its no-solicitation policy, questioning employees about their support for the Union, creating the impression of surveillance, stating the futility of unionization, and threatening to close its stores if the Union won the election. Additionally, the Board found that Lawson violated section 8(a)(1) and (2) of the Act by sponsoring the formation of an employee committee to deal with the Company concerning hours, wages, and conditions of employment and by interfering with and dominating the committee. Finally, the Board found that Lawson violated section 8(a)(1) and (3) of the Act by granting new or improved insurance coverage, holiday pay, death-in-family benefits, and a disciplinary appeal system in order to induce the employees to reject union representation. The Board's order required Lawson to desist from unfair labor practices, break up the employee committee, and post the appropriate notices.

Lawson attacks the Board's order on three grounds. First, Lawson claims that anti-union animus was not the motivating factor in its actions with respect to its sales assistants. Second, Lawson claims that the employee committee is not a "labor organization" as defined by section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5). Finally, Lawson claims that it did not receive a fair and impartial hearing before the administrative law judge.

Lawson concedes that the Board's findings rest on witness credibility with respect to the claims that Lawson threatened employees with store closings, threatened to engage in surveillance of Union activities, interrogated employees about their pro-union sentiments, and asked employees to withdraw their authorization cards. Lawson's only challenge to these findings is that they are suspect because the administrative law judge resolved all credibility determinations in favor of the Board's witnesses and against the Compa-

ny's witnesses. The Supreme Court has held, however, that, "total rejection of an opposed view cannot impugn the integrity or competence of a trier of fact." *NLRB v. Pittsburgh S.S. Co.*, 337 U.S. 656, 659, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602 (1949). Each factual finding must be considered on its own merits. *Id.* Lawson has not challenged the merits of the Board's factual findings. Lawson also has not developed an argument in support of its claim that it did not discriminatorily enforce its no-solicitation policy. We will not disturb the Board's findings with respect to these violations of section 8(a)(1).

Lawson contends that the Board improperly concluded that the Company violated section 8(a)(1) of the Act by sponsoring the formation of an employee committee and section 8(a)(1) and (3) of the Act by granting new or improved insurance coverage, holiday pay, death-in-family benefits, and a disciplinary appeal system in order to induce the employees to reject union representation.

■ Section 8(a)(3) of the Act provides:
(a) It shall be an unfair labor practice for an employer...

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ....

Section 8(a)(1) of the Act prohibits "conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). Under each section, the employer's motive is the critical element in determining whether a grant of benefits prior to a representation election violates the Act.

■ The Board in *Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enf'd as mod.*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), adopted a test for evaluating "cases alleging violation of section 8(a)(3) or violations of section 8(a)(1) turning on employer motivation." *Id.* at 1085. Pursuant to this test, which we have adopted, *NLRB v. Consolidated Freightways Corp.*, 651 F.2d 436, 437 (6th Cir.1981), the General Counsel must

make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

*Wright Line*, 251 N.L.R.B. at 1085. A review of the record indicates that the Board failed to apply the *Wright Line* burden-shifting analysis. Instead, the Board appeared to conclude that the prima facie showing of anti-union animus was so strong that it was justified in rejecting, without analysis or reference to the *Wright Line* standards, the rebuttal evidence proffered by the Company. Had the Board followed the mandate of *Wright Line*, we may well have agreed that the evidence as a whole warranted a conclusion that anti-union animus was the dominant motive in the Company's actions. Because the Board failed to adhere to the proper procedures, however, the Board did not properly conclude that Lawson violated section 8(a)(1) by sponsoring the formation of an employee committee and section 8(a)(1) and (3) by granting new or improved insurance coverage, holiday pay, death-in-family benefits, and a disciplinary appeal system.

■ Lawson next challenges the Board's finding that the Company dominated and interfered with the formation and administration of a labor organization—the Sales Assistant Committee—in violation of section 8(a)(2) of the Act, 29 U.S.C. § 158(a)(2). First, Lawson contends that the employee committee is not a "labor organization" as defined by the Act, which provides:

The term "labor organization" means any organization of any kind, or any agency or *employee representation committee* or plan in which employees participate and which *exists for the pur-*

*pose, in whole or in part, of dealing with employers concerning grievances,* labor disputes, wages, rates of pay, hours of employment, or conditions of work.

29 U.S.C. § 152(5) (emphasis added). To us the Sales Assistant Committee would fall squarely within this definition. Employees attending small group meetings in March, after the initiation of the union organization effort in February, selected representatives to serve on a committee with the understanding that it would discuss their complaints and present their viewpoint to management. The employee representatives in fact met with management and discussed a variety of employment topics, including holidays, hospitalization insurance, death-in-family benefits, and a disciplinary appeals system. Following these meetings, Lawson issued a progress report which implied that the committee had been instrumental in obtaining improvements for all employees.

Lawson, however, contends that a strict interpretation of the statute would reinforce an "archaic adversarial approach to labor relations." Lawson suggests that we have adopted a more "enlightened" approach, which the Company argues was applied in *NLRB v. Streamway Division, Scott & Fetzer Co.*, 691 F.2d 288 (6th Cir. 1982). *Streamway* does not support Lawson's argument.

*Streamway* merely held that the particular employee committee under consideration was not a labor organization as defined by the Act. The employees in *Streamway* communicated with management on an individual rather than representative basis; the employer did not exhibit an anti-union animus; the committee was formed well before any union organizational drive began; and there was only one isolated incident of the company granting a benefit after consultation with the committee. *Id.* at 295 & n. 11.

In contrast to the employee committee in *Streamway*, Lawson's Sales Assistant Committee was established at the height of a union organizational campaign and was representational in nature. Further, the record establishes that Lawson exhibited an anti-union animus and that recommendations by the committee were quickly adopted by the Company. In short, Lawson may not take advantage of the narrow holding in *Streamway*.

■ Lawson also claims that even if the employee committee is a labor organization, it was not dominated by the Company. The record clearly fails to support this argument. The ultimate question with respect to unlawful domination or interference is whether the employer has been able to "induce adherence of employees to the [labor organization] in the mistaken belief that it was truly representative and afforded an agency for collective bargaining." *Federal-Mogul Corp. v. NLRB*, 394 F.2d 915, 918 (6th Cir.1968) (quoting *NLRB v. Pennsylvania Greyhound Lines*, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831 (1938)). An employer dominates a labor organization if employer cooperation with the employee committee "inhibit[s] self-organization and free collective bargaining." *Federal-Mogul*, 394 F.2d at 918. The Board's finding of company domination and interference will be upheld if it is supported by substantial evidence in the record. *Modern Plastics Corp. v. NLRB*, 379 F.2d 201, 203 (6th Cir.1967); *NLRB v. Sharples Chemicals, Inc.*, 209 F.2d 645, 652 (6th Cir.1954).

■ This record contains overwhelming evidence that Lawson dominated and interfered with the employee committee. Lawson formed the committee in direct response to the organizational campaign. The committee held no meetings apart from its discussions with management, formed no coherent program or plan of action, and discussed only those subjects that Lawson's senior management determined were of greatest concern to the employees. The meetings with management were held on Company premises, employee representatives were paid for their time, and the Company provided lunch. Discussion proceeded according to an agenda prepared by management. The sales assistants did not take minutes and communica-

tions concerning the committee's work were written and circulated by management.

Lawson argues, based on *NLRB v. Homemaker Shops, Inc.,* 724 F.2d 535 (6th Cir.1984), that the Board may not conclude that an employer has dominated an employee committee unless the employees have expressed dissatisfaction with the committee. *Homemaker Shops* merely established that employee satisfaction with an existing committee is one element that the Board should consider in determining whether the employer has violated section 8(a)(2). *Id.* at 547. Moreover, even that limited holding was made in the context of a case in which the existing committee was Board-certified, the complaint charged unlawful assistance rather than actual domination, and the General Counsel adduced no evidence that the employer created the Committee. *Homemaker Shops* cannot stand for the broad proposition urged by Lawson. Further, Lawson employees have expressed dissatisfaction with the Sales Assistant Committee by signing union authorization cards. We uphold the Board's finding on the domination issue because its conclusion is based on substantial evidence on the record as a whole. *Homemaker Shops,* 724 F.2d at 544–45.

■ Finally, Lawson contends that it did not receive a fair hearing before the administrative law judge. Lawson focuses on an exchange during the cross-examination of a Company witness. Counsel asked the witness to discuss the nature of the Sales Assistant Committee. The witness began to respond, "Actually, it is a process." At that point, the administrative law judge interjected:

> It is a technique, a method, a communication from the mind that coordinates the mental capacity of the human race.... But I know what a negotiating committee is and so does Board law.

(emphasis added).

The underscored statement is said to demonstrate that the administrative law judge was predisposed to find that the Company committed an unfair labor practice. The difficulty with Lawson's argument is that at the time the statement was made four sales assistants had testified without contradiction that the purpose of the committee was to present employee grievances. Documents relating to the operation of the committee, such as agendas and progress reports, already had been introduced. Given the context, the administrative law judge's statement merely acknowledged what was to him, and is to us, obvious.

Lawson's other objections to the conduct of the law judge are equally without merit. The vitriolic language in the administrative law judge's opinion was unnecessary, but he undoubtedly felt it was warranted given the facts of this case. Harsh language of itself does not establish prejudice. We are not here approving these statements; we are here taking the evidence, adduced at an open and public hearing where both sides were given equal opportunity to present whatever evidence they felt appropriate, and given those facts determining that under the standard of *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), there is substantial evidence to uphold the decision of the Board.

Lawson's petition for review of the Board's order is granted with respect to the Board's conclusion that Lawson violated section 8(a)(1) by sponsoring the formation of the Sales Assistant Committee and section 8(a)(1) and (3) by granting new or improved insurance coverage, holiday pay, death-in-family benefits, and a disciplinary appeal system. Lawson's petition for review of the Board's order is denied and the Board's cross-application for enforcement is granted with respect to the Board's conclusion that Lawson violated section 8(a)(1) by soliciting employee grievances, expressly or impliedly promising to remedy them, asking employees to withdraw their signed authorization cards, disparately enforcing its no-solicitation policy, questioning employees about their support for the Union, creating the impression of surveillance, stating the futility of unionization, and

threatening to close its stores if the Union won the election, and that Lawson violated section 8(a)(2) by sponsoring, interfering with, and dominating the Sales Assistant Committee. Because the General Counsel challenged the validity of the Sales Assistant Committee only in those stores which the Union has sought to organize, the Board's disestablishment order will be enforced only with respect to those stores.