**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**OKUN BROTHERS SHOE STORE, INC., Respondent.**

**No. 85–6038.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 16, 1986.

Decided July 29, 1987.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Helen Morgan, Steven Smith (argued), Bernard Gottfried, Director, Region 7, N.L.R.B., Detroit, Mich., for petitioner.

John J. Mallon (argued), Troy, Mich., Terence Brennan, for respondent.

Before ENGEL, JONES and KRUPANSKY, Circuit Judges.

ENGEL, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order issued July 19, 1985 and reported at 275 N.L.R.B. 1019. The Board found that respondent Okun Brothers Shoe Store, Inc., had violated section 8(a)(1) of the National Labor Relations Act by threatening its employees with reduction in hours if they chose union representation, by interrogating an employee concerning union activities, and by soliciting employee grievances with an implied promise to correct them if the employees rejected union representation. 29 U.S.C. § 158(a)(1) (1982). In addition to the posting of the usual notices the Board directed that a representation election, held on May 26, 1981 and resulting in a 19–19 tie vote, be set aside and that a new election be conducted.

We uphold the Board's determination that the respondent was guilty of a section 8(a)(1) violation by threatening employees with a reduction in hours and therefore uphold as well its order for a new election. We conclude, however, that substantial evidence does not support the Board's determination of the other two violations.

The respondent Okun Brothers Shoe Store, Inc., is a family-owned retail shoe outlet that has been in operation in Kalamazoo for approximately sixty years. The most recent owner of the store was Leon Okun, but at the time of the events giving rise to this action, Leon had been compelled to withdraw from active management due to serious illness. As a result, the duties of general manager and chief executive officer of the store fell upon Leon's brother Marvin, who was obliged to divide his time between the shoe store and his own insurance company in Kalamazoo. In the winter and early spring of 1981 the United Food and Commercial Workers International Union, AFL–CIO, instituted a campaign to organize the shoe store employees, and on April 13, 1981 a representation petition was filed, followed on April 30 by a stipulation for certification upon consent election. This was approved by the regional director of the Board, and an election was scheduled and held May 26, 1981. At that time forty-three employees comprised the bargaining unit and the election resulted in a 19–19 tie vote, which of course spelled defeat for the union.

The union later filed objections to the election, and a resulting consolidated unfair labor practice proceeding led to a hearing in Kalamazoo on June 25 and 26, 1982 before an administrative law judge (ALJ) who thereafter issued the order now sought to be enforced.

The evidence presented to the ALJ and embodied in the record before the Board and before us shows that approximately one month before the scheduled election Assistant Manager Cris Nezamus approached two employees, Smirle Weston and Tony O'Brien in the break area of the store and said something about the employees voting in a union and their hours probably getting cut. Nezamus also said that any action regarding employee hours would probably be taken care of by the store manager, Charlie Steele. Both Weston and O'Brien testified that Nezamus said that the employees would be cut down to a forty-hour week if they voted in the union, at least a ten- to twelve-hour reduction from the hours then being assigned each week. Ostensibly the conversation

began when Nezamus expressed uncertainty as to whether he should personally join the union. Weston's reaction to Nezamus' comments was somewhat ambivalent. He testified at one time that he understood those statements to be threats although in an earlier affidavit he had testified that Nezamus may have been talking to himself. O'Brien for his part testified that the employees were never sure whether Nezamus spoke for the company or for himself and it was evident that O'Brien had little respect for or fear of Nezamus. Apparently Nezamus had tried to fire O'Brien once, but he did not succeed.

About a week after the first incident, Nezamus asked employee Weston how many employees he thought had signed up; Weston assumed that Nezamus meant how many had signed up to vote for the union and replied that he thought they had twenty-five employees. Weston then testified that Nezamus again was wondering whether he should join the union, but acknowledged that Nezamus seemed more curious than anything.

Finally, during the period immediately preceding the election, Okun Brothers hired the management consultant firm of Craft and Barresi to assist it in communicating the management's position regarding unionization. Representatives from the consulting firm were present in the store from one to three weeks prior to the election. Eerbeck, one of the consultants, confirmed Marvin Okun's testimony that the company had been hired to help answer employees' questions regarding the upcoming election, to provide relevant information, and to listen to any concerns employees might have. The consulting firm also held employee meetings at which it described election procedure and solicited questions from the employees. During at least some of these meetings the question of an employee handbook was raised; the possibility of a handbook had been previously discussed between the employees and the consultants and by the employees at union meetings. The lead member of the consulting team said, "I can't promise you that our company would be hired to write an employee handbook; but we have written them in the past, and they cover all the fringe benefits that you are talking about. Because we have experience in these matters, we can get this done very quickly." In response to an employee question, another consultant stated that there was no recourse for employees if a handbook turned out to be one-sided or strictly pro-management. Throughout the meetings with the employees, the consultants and the store manager were very careful to point out that they could make no promises to the employees because of the strictures placed upon employer action by the National Labor Relations Act.

It is hornbook law of course that we must uphold and enforce the decision of the Board if substantial evidence on the record as a whole supports its findings, even though we might justifiably have made a different choice had the matter been before the court *de novo*. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Dayton Typographic Service, Inc. v. NLRB*, 778 F.2d 1188, 1191 (6th Cir.1985); *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 660 (6th Cir.1983).

██ The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights. *NLRB v. Norbar, Inc.*, 752 F.2d 235, 238 (6th Cir. 1985). In making this determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact upon the employees. *NLRB v. E.I. DuPont de Nemours*, 750 F.2d 524, 528 (6th Cir.1984) (citing *Henry I. Siegel Co. v. NLRB*, 417 F.2d 1206, 1214 (6th Cir.1969)). This assessment should take into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Peabody Coal Co. v. NLRB*, 725 F.2d 357, 363 (6th Cir.1984) (quoting *NLRB v. Gissel Packing Co.*, 395

U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969)).

## I.

█ In determining whether Cris Nezamus' statements to employees Weston and O'Brien tended to restrain them in the exercise of their rights, it is necessary of course to examine the context in which those statements were made. Okun Brothers asserts that Nezamus' statements regarding a cut in hours were only predictions or opinions of what would occur if the employees should vote in the union. However Weston testified that he understood the statements to be threats, and O'Brien testified that he was never sure when Nezamus acted on his own or when he represented management even though he did not generally listen to Nezamus "unless it suited him." Predictions or opinions concerning the effect of unionization must be based on objective fact in order to insulate an employer from a charge of violation of the Act. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–20, 89 S.Ct. 1918, 1942–43, 23 L.Ed.2d 547 (1969). The record shows no factual basis for Nezamus' statements.

█ Weston was apparently the only employee to testify that he felt threatened by Nezamus' statements. Normally the uncorroborated testimony of an interested party does not amount to substantial evidence of an unfair labor practice. *See NLRB v. Otsego Ski Club-Hidden Valley, Inc.*, 542 F.2d 18, 19 (6th Cir.1976); *NLRB v. Elias Bros. Big Boy, Inc.*, 327 F.2d 421, 426 (6th Cir.1964). However, where the testimony is uncontradicted and properly found to be credible, that testimony may be substantial evidence to support the Board's determination. *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 662 (6th Cir.1983). There was no contradiction by anyone from Okun Brothers concerning Nezamus' statements although there were internal inconsistencies in the testimony of the two employees as to the precise words used.

Respondent's principal defense to the unfair labor practice charge was either to deny or at least diminish the importance of Nezamus' role in company management by indicating that he was primarily a buyer who had very little authority in the actual management of the company and who was not considered by either management or the employees as having any great authority or commanding any particular respect. For this reason it is urged that any statements Nezamus might have made could not have been taken too seriously and certainly would not have been perceived as coercive.

We do not believe that respondent may at this point deny that Nezamus was a part of management. In his testimony before the ALJ Marvin Okun described Nezamus as a manager at the store: "Well at that time immediately before the election, I was functioning in the capacity of the general manager. Charlie Steele was the primary person that I would make policy decisions with. Cris Nezamus was also a manager at the store, in a slightly subservient order to Charlie. Charlie was the primary person next in charge." Marvin Okun testified that he probably devoted about a third of his time to the shoe store during the months preceding the election, the rest being devoted to his own insurance business.

It may well be, as Okun Brothers argues, that the employees did not feel particularly threatened by Nezamus himself, but there can be little doubt that they did identify him with store management. In fact the company stipulated that Nezamus was a supervisor. There was also evidence that Nezamus had in the past assigned work duties and had actually discharged some employees. More persuasive to us and we believe to the Board, however, was the fact that as weak as Nezamus himself might have been, his comments had particular credibility when, perhaps acknowledging his own ineffectiveness, he indicated that he would allow Charlie Steele, the store manager, to handle any changes in overtime rather than implementing those changes himself. Thus while the employees might not have believed that Nezamus personally could or would effect the cut in hours, they surely could have believed as an assistant store manager, he would be privy to management plans. An employee pondering how to vote in the election could

easily have concluded from Nezamus' statements that such action was under serious consideration by management should the union be voted in.

▉ Both the Board and the courts have been particularly sensitive to threats and promises made by either labor or management in efforts to coerce employees into voting one way or another in a union certification election. Certainly even an unsubstantiated and unjustified threat to reduce economic benefits in the event the union was voted in would be highly material and have a strong tendency to coerce employees if believed. Further it is clear that the actual effect of a statement is not so important as is its tendency to coerce. *Peabody Coal Co.*, 725 F.2d at 365. In several cases where the defendant employer asserted that particular statements were opinions and not threats, courts of appeals have upheld the Board order based upon the reasonable inference by employees that such statements were directed toward their decision to join the union. *See, e.g., Peabody Coal Co.*, 725 F.2d at 362–63; *NLRB v. Solboro Knitting Mills, Inc.*, 572 F.2d 936, 940 (2d Cir.1978). Only where the threats or opinions refer to matters over which the speaker has no control may employees not reasonably conclude that they are being coerced. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).

▉ Here, even if employees Weston and O'Brien did not feel threatened by Nezamus himself, a statement by the assistant store manager that hours would probably be cut would indeed tend to be coercive. As stated, that coercive tendency is particularly strong when the hour reduction would result in a substantial pay cut for most of the store employees. While there may be many factors bearing upon an employee's decision to vote one way or another in a union certification election, certainly the most persuasive factor is money—whether in the long run the employee will be economically benefited or injured by union representation. Few persons knowledgeable in labor relations would doubt that the foremost question motivating a decision on

a union certification vote is "what's in it for me?" This court has been and should continue to be equally sensitive to unlawful threats or promises by management in order to induce favorable votes in union certification elections, as it has been to similar activity on behalf of unions.

In recognizing the coercive tendency of the statements made by Nezamus, we acknowledge the correlation between unlawful inducements offered by management and those offered by a union as in *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), *aff'g* 470 F.2d 305 (6th Cir.1972). In *Savair* Justice Douglas held that a labor union's offer to waive initiation fees for all employees who signed union authorization cards before a certification election interfered with the employees' rights to refrain from union activities guaranteed by the National Labor Relations Act and did not comport with the principle that employees should fairly and freely choose bargaining representatives. Our circuit has consistently obeyed *Savair* to set aside elections won by the union when it appeared that the employees' vote could have been affected by improper inducements to waive or reduce the actual amount of union dues for those who prior to the election were willing to sign authorization cards. *Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288 (6th Cir.1984); *NLRB v. Johnson and Hardin Co.*, 554 F.2d 275 (6th Cir.1977); *NLRB v. Savair Mfg. Co.*, 470 F.2d 305 (6th Cir.1972), *aff'd*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). *See also NLRB v. Madisonville Concrete Co.*, 552 F.2d 168 (6th Cir.1977); *Falcon Coal Co. v. NLRB*, 527 F.2d 570 (6th Cir. 1975); *Plastic Masters, Inc. v. NLRB*, 512 F.2d 449 (6th Cir.1975) (recognizing violations based on union inducements having a tendency to influence election results). As it has been the judgment of our circuit and of the Supreme Court that employees could be unfairly influenced in their decision to vote by the promise of relatively small economic gain through reduction in union dues, how much more impact occurs by a threatened loss of what the Board found to be sixteen hours of weekly overtime and which could represent nearly forty percent

of an employee's take-home pay? If there is any doubt about the importance of that threat in this election, it is sufficient to note that the election resulted in the 19–19 tie. We find it significant that the Supreme Court in *Savair* took special note that upon the facts there, "the change of just one vote would have resulted in a 21–21 election rather than a 22–20 election." 414 U.S. at 278, 94 S.Ct. at 499. In like vein our court commented in *NLRB v. Mr. Porto, Inc.*, 590 F.2d 637, 639 (6th Cir.1978): "In light of the very small unit involved and the closeness of the representation election (a switch of only two votes would have altered the outcome), we cannot say that the illegal acts of intimidation by the union were so remote as to have had no effect on the election."

## II.

With regard to the other violations found by the administrative law judge and by the Board, we agree with dissenting Board Chairman Dotson that no supportable case was made out.

 Nezamus' inquiry of employee Weston concerning how many employees might have signed up for the union, as described by Weston himself, obviously carried no threat with it nor was considered coercive. Infrequent, isolated and innocuous inquiries of one employee, standing alone, do not constitute interference or restraint within the meaning of section 8(a)(1). *Elias Bros. Big Boy, Inc.*, 325 F.2d 360, 364 (6th Cir.1963); *NLRB v. Streamway Division*, 691 F.2d 288, 296 (6th Cir. 1982); *NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 548–49 (6th Cir.1984). The Board appears to have believed that by questioning Weston, Nezamus was building upon his earlier threat of a reduction in hours and was at least obliquely asking Weston how active he was in the union's organizing drive. However, none of the evidence before the Board shows that Nezamus' questioning of Weston had a coercive effect. To the contrary, Weston testified that Nezamus himself was uncertain whether he should sign up for the union and that Nezamus seemed merely "curi-

ous" about the signup. While the Board is correct that the company was actively opposing the union, Nezamus' posture was not nearly so clear. That he was indisputably a part of the management and yet considering membership in the union is indicative of his ambivalence and of the harmless nature of his question.

 Similarly we agree with Chairman Dotson that no violation was shown either in the hiring of the consulting firm or in the conduct of the members of the firm at employee meetings prior to the election. The hiring of such a team is certainly understandable under the circumstances here. The owner and regular manager of the company was completely inactive by reason of serious illness, and his brother was obliged to take over on the eve of a union certification election while continuing to run his own insurance business. Marvin Okun, as noted, was able to spend only about a third of his time each week in the store. Both he and the ailing Leon seem to have had only Charlie Steele and Cris Nezamus to rely upon at this particularly sensitive period in the store's existence. Steele appears to have had strong administrative talent but Nezamus is hardly pictured by anyone as a tower of strength; he lost his job shortly after the incidents discussed, although we are not told whether his termination preceded or followed the election or the precise reasons therefor. The management team appears to have been highly professional. They were particularly careful to avoid any promises unfairly designed to impinge upon the employees' freedom of choice for or against unionization or reasonably calculated to have that effect. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964).

 Grievance solicitation during a pre-election period is not a per se violation of section 8(a)(1). *NLRB v. Arrow Molded Plastics, Inc.*, 653 F.2d 280, 283 (6th Cir. 1981); *Idaho Falls Consol. Hospitals, Inc. v. NLRB*, 731 F.2d 1384, 1386 (9th Cir. 1984). As the Board itself held in *Uarco, Inc.*, 216 N.L.R.B. 1 (1974):

However, it is not the solicitation of grievances itself that is coercive and violative of Section 8(a)(1), but the promise to correct grievances or a concurrent interrogation or polling about union sympathies that is unlawful; the solicitation of grievances merely raises an inference that the employer is making such a promise, which inference is rebuttable by the employer.

*Id.* at 1–2. The question therefore is whether Okun Brothers rebutted any inference of promises, assuming that the employees might have been led to make such an inference from what seems to have been relatively isolated and innocuous comments by the management consultants.

Our court has upheld solicitation as an unfair labor practice when the employer not only solicited grievances but accompanied them with promises and actions that would indicate to employees a change of company policy as a substitute for union representation. See, *e.g.*, *Lawson Co. v. NLRB*, 753 F.2d 471 (6th Cir.1985), where upon a complaint of insufficient work hours, the employer promised a full work week and suggested solutions or promised to investigate other complaints. *See also NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 240 (6th Cir.1983); *NLRB v. Frederick's Foodland, Inc.*, 655 F.2d 88, 89 (6th Cir. 1981); *NLRB v. Naum Bros., Inc.*, 637 F.2d 589, 591 (6th Cir.1981); *Jerry Davidson Buick Sales & Service, Inc. v. NLRB*, 415 F.2d 324, 324 (6th Cir.1969). In each of those cases, so far as we can determine from the record, the employer seems to have made specific promises and not to have clearly disclaimed any ability to follow through on promises. Indeed we observed in *Arrow Molded Plastics* that the record there was "replete with instances of promises made with the intent to reverse the Union's previous card majority." 653 F.2d at 223.

In contrast to the above cases, here there is no direct evidence that Okun Brothers expressly conditioned any employee benefits upon withdrawal from union activity or votes against the union. Indeed, Marvin Okun and the consultants were very careful to state repeatedly that no promises could be made regarding future company action. The only possible promise on the present facts was that somehow, if the consulting firm were retained after the union lost the election, it would prevail upon management to produce an employee handbook. In fact, in response to questions from employees concerning employee handbooks, the management team specifically negated that possibility by stating that they could not promise a handbook. The consulting firm, which the employees knew had been called in to assist management during the pre-election period, thus merely answered the inquiries based upon their experience with other companies. They indicated that they had no authority whatever to make promises on behalf of Okun Brothers.

The management team's response to employee questions strongly rebuts the inference of unlawful conduct in our view and ought to have been persuasive to the Board. The idea of an employee handbook was first raised not by Okun Brothers or the consultant team but by the employees. There was a total absence of any testimony by the employees that they felt they had been promised any future benefits either from the production of an employee handbook or in any other way. At least one employee, Zeigler, testified that he did not even expect to see a handbook after the employee meetings concluded. Marvin Okun and the consultants made no explicit promises of benefits and, on the contrary, repeatedly stressed their inability to make promises. Finally, any statements concerning an employee handbook were made by the outside consulting firm and not by management directly, and thus the employees would be and in at least one instance were skeptical of whether company management would implement that alternative after the election.

The ALJ, in finding improper solicitation of grievances and implied promises to correct them, appears to have relied to some extent upon the transcript of employee Bernard Krause's testimony. Krause testified that he asked Mr. Greg Embry of the con-

sulting firm, "... what could happen—or what recourse employees would have if the handbook turned out to be a one-sided affair or strictly a pro-management, this is what you've got. Take it or leave it. He said there was no recourse to that sort of thing." The respondent apparently believes that Mr. Krause was pro-union and was deliberately attempting to bait Mr. Embry into committing a violation of the Act by the inquiry concerning an employee handbook. However, one need not accept that version in order to conclude that the responses elicited did not support the ALJ's conclusion that implied promises had been made unlawfully to influence employee votes. As dissenting Chairman Dotson noted:

> There is no evidence that the Respondent, by management or through the consultants, introduced the handbook issue into the organizational campaign, and at the employee meetings it was the employees who raised the issue. In responding to the employees' questions about a handbook and to their complaints, neither management nor the consultant directly promised a handbook or anything else. Instead they repeatedly and emphatically stated they could not and would not promise anything. Accordingly, I would find that the evidence refutes any inference that the Respondent's discussing problems with employees impliedly promised to correct the problems.

Accordingly, so much of the Board's order as directs the respondent Okun Brothers to cease and desist from threatening employees concerning reduced hours and harsher working conditions in the event the employees chose union representation, is ENFORCED as is the Board's direction that the election of May 26, 1981 be set aside. The case is REMANDED to the regional director for the purpose of conducting a new election. In all other respects, however, enforcement of the Board's order is DENIED.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

I concur in Part I of Judge Engel's opinion enforcing the Board's order that Okun Brothers cease and desist from threatening employees with a reduction in hours and less favorable working conditions. I also concur in Part II of Judge Engel's opinion to the extent that it denies enforcement on the "interrogation" issue. Like my fellow judges, I find the record as a whole lacking in substantial evidence to support the inference that Nezamus' inquiry of Weston regarding the sign-up progress was either intended to be, or taken as, coercive. However, I respectfully dissent from the remainder of Part II and the court's denial of enforcement on the "implied promises" issue.

Contrary to the majority's suggestion, this circuit has not ascribed talismanic significance to an employer's disclaimer of promises when the question presented is whether there were *implied* promises to redress grievances in violation of section 8(a)(1). *See NLRB v. Arrow Molded Plastics, Inc.*, 653 F.2d 280, 282–83 (6th Cir. 1981). Furthermore, in reviewing findings of implied promises, both logic and law require that we defer to the ALJ, who had the opportunity to view live testimony, as well as to the Board, which has the administrative expertise in such matters. We have always held that the Board's reasonably drawn inferences concerning coercive effect "will not be set aside on review, even though a different inference or conclusion may seem more plausible and reasonable to us." *Surprenant Mfg. Co. v. NLRB*, 341 F.2d 756, 760 (6th Cir.1965); *accord NLRB v. Garon*, 738 F.2d 140, 141–42 (6th Cir. 1984). I find substantial evidence in the record as a whole to support the Board's inference of "implied promises" and would enforce that portion of the Board's order.

KRUPANSKY, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's determination that Okun Brothers Shoe Store, Inc. (Okun) did not engage in unfair labor practices when (1) it hired a management consultant firm to assist in communicating management's position concerning unionization, and (2) supervisor Chris Nezamus (Neza-

mus) questioned employee Smirlie Weston (Weston) about the number of employees who had signed up to vote for the union.

However, because Nezamus' unsupported conjecture of a possible reduction in hours did not tend to interfere with, coerce or restrain employees in the exercise of their rights to self-organization, I must respectfully dissent from Part I of the majority opinion.

The record disclosed that, by all accounts, Nezamus was a supervisor in name only. Employee Mark De Lisle (De Lisle) testified that all Okun employees were aware of his lack of authority and that everyone knew he did not speak for management.[1] De Lisle's impressions were confirmed by Francis O'Brien (O'Brien) and Weston, the employees to whom the statement about reduction in hours was directed. O'Brien testified that he had defied Nezamus' instructions on various occasions and that, in fact, he had continued working after Nezamus had attempted to discharge him. In addition, Weston executed an affidavit in which he stated that Nezamus "never gave me the impression that he was reporting back to anyone" after engaging in conversations about unionization. Weston further acknowledged that Nezamus had, himself, been considering joining the union, a fact which demonstrated that he was, by no means, a voice of the management team.

Both O'Brien and Weston testified that Nezamus' predictions about the effects of unionization were phrased in equivocal language. O'Brien testified that Nezamus prefaced his statements about a reduction in hours with the words "I don't know." Similarly, Weston testified that Nezamus stated that hours would "probably" be cut.

This circuit has concluded that a statement of a supervisor relating to unionization will be deemed coercive if, when viewed in all the surrounding circumstanc-

es, its probable effect tends to interfere with the employees' free exercise of their rights to self-organization. *NLRB v. E.I. DuPont de Nemours,* 750 F.2d 524, 527 (6th Cir.1984). Considering the low esteem in which Nezamus was held by Okun employees and their knowledge that he didn't speak for management, coupled with the innocuous import of his comments, Nezamus' statement about the possibility of a reduction in hours had no coercive tendencies.

Accordingly, for the reasons stated above, I would reverse the Board's decision and deny enforcement of the Board's order.

---

1. De Lisle testified as follows:
 Q. Do you know a person named Chris Nezamis? [sic]
 A. Sure.
 Q. Who is he?
 A. He's manager, I guess.
 Q. Why do you say, "You guess."?

A. Well, that's the title they hung on him. I don't really know what—it didn't really mean much of anything.
Q. Why didn't it mean much of anything?
A. *Because nobody really paid any attention to him.*