865 F.2d 258
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
UARCO Incorporated, Intervenor.
 No. 88-5089.
 United States Court of Appeals, Sixth Circuit.
 Dec. 28, 1988.
 
 Before KEITH, KENNEDY and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW ("Union") petitions this court to set aside an order of the National Labor Relations Board ("NLRB" or "Board") reversing in part the decision of an Administrative Law Judge ("ALJ") finding intervenor-employer UARCO, Inc. ("UARCO") in violation of sections 8(a)(1), (2) and (3) of the National Labor Relations Act (29 U.S.C. Secs. 158(a)(1), (2) and (3) (1982)) ("the Act") and ordering UARCO to bargain with the Union. The Board dismissed many of the ALJ's findings of unfair labor practices and concluded that the remaining unfair practices justified a second ele?? not a bargaining order. The Union disputes the Board's conclusion that anti-Union election campaign literature sent by UARCO did not violate section 8(a)(1) of the Act. It also asserts that the Board erred in finding a bargaining order inappropriate on the facts of this case. Because we believe the Board's conclusions are supported by substantial evidence, we deny the petition.
 
 
 2
 UARCO operates a manufacturing plant in Radcliff, Kentucky. In February of 1980 approximately 310 people were employed at the Radcliff plant. In January of 1980 the Union began a campaign to organize the plant's production and maintenance employees. An election was held on March 21, 1980. The Union lost the election by a vote of 105 to 101.
 
 
 3
 In the months preceding the election UARCO's management mounted an informational campaign to appraise the employees of what management considered to be the dangers presented by the Union. This campaign consisted primarily of 10 letters and 13 "Fact Bulletins" distributed to all UARCO employees at the plant between February 27 and March 19, 1980. The contents of these bulletins and letters included accurate and objective factual statements concerning the possible deleterious effects of unionization as well as more forceful statements obviously calculated to inform the employees of a possible strike and close-down at the plant as a result of possibly excessive Union demands and economic necessity. See Appendix A.
 
 
 4
 In addition to the letters and bulletins, UARCO management conducted approximately 23 meetings with employees between March 3 and March 19, 1980. These meetings, conducted by the plant manager, a UARCO vice president, the personnel director and a UARCO attorney, were attended by almost all of the employees. In these meetings the UARCO representatives answered questions and addressed employee concerns about the upcoming representation election. Witnesses testified before the ALJ that the UARCO representatives, while expressing their belief that employee benefits might be lost as a result of Union-sponsored bargaining, openly stated that the plant would not close solely because of the Union's designation as bargaining agent. During the course of these meetings at least one employee protested that he and others, nevertheless, remained "scared" by UARCO's written campaign.
 
 
 5
 Following the election, the NLRB's General Counsel issued a complaint against UARCO alleging numerous unfair labor practices. After a hearing, an ALJ found, inter alia, that UARCO had unlawfully coerced its employees through its pre-election campaign literature ?? the literature's coercive impact was not tempered by management's responses to employee questions at informational meetings, and, primarily because of UARCO's extensive written campaign, that an order to bargain would be appropriate given the continuing fears of employees. Both parties filed exceptions to the ALJ's decision.
 
 
 6
 On September 30, 1987, a three-member panel of the NLRB issued a decision, with one member dissenting in part, sustaining some of the ALJ's findings but dismissing the allegations of unfair practices as to several incidents including the allegation concerning UARCO's campaign literature. The Board found the remaining unfair labor practices insufficient justification for the issuance of the bargaining order which the ALJ had based principally upon the coercive effects of the campaign literature. In light of UARCO's "proclivity to violate the Act," however, the Board prescribed the traditional remedy of a broad cease-and-desist order coupled with a direction for a second election. The Union appealed.
 
 
 7
 This Court must uphold the decision of the NLRB if substantial evidence supports the Board's decision when examined on the record as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951). The administrative record includes the opinion and findings of the ALJ as well as the opinion of the Board. Id. at 494-97. This deferential standard of review on appeal "recognize[s] the Board's special function of applying the general provisions of the Act to the complexities of industrial life." NLRB v. Erie Re?? Corp., 373 U.S. 221, 236 (1963). To this end we note that the NLRB's General Counsel bears the burden of proving an unfair labor practice allegation and if the Board holds that he has failed in his proof the Board's determination in this respect "must be upheld unless the determination has no rational basis in the record." Allbritton Communications Co. v. NLRB, 766 F.2d 812, 817 (3d Cir.1984), cert. denied, 474 U.S. 1081 (1986). The Board's decision to implement a particular remedy is entitled to particular deference on appeal because "[i]n fashioning its remedies under the broad provisions of Sec. 10(c) of the Act ... the Board draws on a fund of knowledge and expertise all its own." NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32 (1969). See also Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540-41 (1943) (Board order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act").
 
 
 8
 In the context of an alleged violation of section 8(a)(1) the Board must examine the employer's conduct to determine whether it "tends to be coercive or tends to interfere with the employees' exercise of their rights." NLRB v. Okun Bros. Shoe Store, Inc., 825 F.2d 102, 105 (6th Cir.1987), cert. denied, 108 S.Ct. 1109 (1988). In determining whether an employer's actions have tended to coerce, the Board should take into account the "total context" in which the challenged conduct occurs. NLRB v. E.I. DuPont de Nemours, 750 F.2d 524, 528 (6th Cir.1984). This total context includes any oral or written communications from the employer to its employees as well as any physical or psychological influence an employer might have over its employees. NLRB v. Virginia Elec. & Power Co., 314 U.S. 469, 478 (1941) ("[i]n determining whether the Company actually interfered with, restrained, and coerced its employees the Board has a right to look at what the Company has said as well as what it has done"). Employer actions which appear completely innocuous to the disinterested observer might in fact serve to intimidate an employee on the verge of making a choice which may affect his ?? occupation and working environment for years to come. Okun Bros., 825 F.2d at ??.
 
 
 9
 The Board, however, must balance the employees' right to an election environment free of intimidation and coercion against the employer's First Amendment right to express its opinion. See Gissel, 395 U.S. at 617 ("an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board"). Section 8(c) of the Act states that an employer may express "any views, argument, or opinion" provided the employer's speech contains "no threat of reprisal ?? force or promise of benefit." 29 U.S.C. Sec. 158(c) (1982). The Supreme Court has de?? the employer's right to communicate as follows:
 
 
 10
 [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.... If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.
 
 
 11
 Gissel, 395 U.S. at 618 (citation omitted). At bottom the Board must answer the question " 'What did the speaker intend and the listener understand?' " Id. at 619 (quoting A. Cox, Law and the National Labor Policy 44 (1960)).
 
 
 12
 Examining the bulletins and letters themselves, we note, as did the Board, that they contain no express threats of any kind or any falsehoods. The ALJ remarked that neither the NLRB's General Counsel nor the Union could offer any evidence of direct falsehoods in the documents. The majority of the literature lists permissible employer responses under the Act, i.e., the termination of economic strikers, and possible consequences of unionization, i.e., the possibility of a strike and subsequent plant closure. So?? UARCO's communications, however, do indeed approach the realm of indirect coercion. The worst example is contained in "Fact Bulletin # 5" where the Radcliff plant manager states that "Cleveland had a unionized plant. In fact, if it hadn't been for the outside union, we probably wouldn't have been forced to close the plant--permanently."
 
 
 13
 Despite a close question with respect to several documents individually, we believe substantial ?? supports the Board's determination that UARCO's campaign literature, ?? viewed in the context of the entire election, did not violate section 8(a)(1). Without a doubt UARCO is playing "hard ball" with some of its literature, however, the impact of the three or four more forcefully phrased memos is softened by the more temperate tone of the remainder. None of the literature contains an express threat that UARCO would take action "solely on [its] own initiative for reasons unrelated to economic necessities and known only to [it]." Gissel, 395 U.S. at 618. Furthermore, the Board was justified in finding that any implication from UARCO's written campaign that it might take unilateral action if the Union were victorious was dispelled by UARCO's oral representations at the employee meetings.
 
 
 14
 The NLRB properly examined the written campaign in the context of the informational meetings. A number of witnesses stated that UARCO's representatives had informed them that bargaining involved "give and take" in which the employees might win, lose or break even. Seven employees testified that UARCO's representatives had either stated that the plant would not close down solely because the employees designated the Union as their bargaining agent or that the plant would close only because it became economically unprofitable to operate. See JA at 69-70. Given the number of meetings, the attendance of almost all the workers, the amount of discussion concerning bargaining and strikes, and the airing of employee complaints, it is difficult to believe that the employees' concerns were not fully addressed by the representatives of UARCO ?? Okun Bros., 825 F.2d at 109 (oral responses of employer's representatives at informational meetings may rebut inferences of unlawful conduct and should be persuasive to the Board). Upon review of the overall impression created by the documents in conjunction with the oral representations, we chose to defer to the Board's determination that the written campaign was not coercive in violation of section 8(a)(1) and was in fact protected employer speech under section 8(c).[1] Cf. Gissel, 395 U.S. at 620 ("reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship"); Boaz Spinning Co. v. NLRB, 439 F.2d 876, 878-79 (6th Cir.1971) (employer's right to free speech coextensive with that of the labor unions).
 
 
 15
 The Union also objects to the Board's decision to order a second election rather than impose an order to bargain. It is undisputed that "[a]n election is the preferred method of determining the choice by employees of a collective bargaining representative." United Servs. for the Handicapped v. NLRB, 678 F.2d 661, 664 (6th Cir.1982). A bargaining order may issue only in exceptional cases containing "outrageous and pervasive" unfair labor practices or "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." Gissel, 395 U.S. at 613-14. The Board should concentrate on whether a fair election can be held in light of "the present effects of past coercive unfair labor practices or present coercive unfair labor practices." United Servs. for the Handicapped, 678 F.2d at 664. See also Gissel, 395 U.S. at 614 ("the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future").
 
 
 16
 Applying these factors to the case at bar, the Board's conclusion that a bargaining order was not warranted is supported by substantial evidence. Although UARCO has violated the Act in several respects, both pre and post-election, none of these violations are so pervasive, severe, or lingering to undermine the fairness of a second election. The unfair labor practices remaining (one interrogation, one threat of plant closure, the solicitation and resolution of employee grievances, the unlawful domination of and assistance to a labor organization, and a post-election refusal to recall a union activist) are all properly resolved through the traditional remedy of a broad cease-and-desist order.
 
 
 17
 For the foregoing reasons, we deny the petition for review.
 
 
 
 [1]
 Despite our holding in this case, we note that under no circumstances may an employer send coercive literature to employees and then attempt to counteract, negate, or cure the coercive effect of that literature through more temperate oral representations. If the literature is sufficiently threatening, oral representations, no matter how even-handed, benign, or conciliatory, will never negate the overall coercive impact of such written statements. Written literature, however, which might be construed to contain implicit threats when viewed in isolation, may be rendered acceptable and uncoercive when considered in conjunction with other employer communications either oral or written